**Wytheville.**

THE SULPHUR MINES CO. OF VIRGINIA V. THOMPSON'S HEIRS.

June 25, 1896.

Absent, Harrison, J.

93   293
94   485

93   293
97   122
d97  442

.105  240
105   553
105   753
j105  761
e105  762

93   233
107  582

93   293'
e108  172

93   293'
109  260

93   293
110  405
110  922

1. EJECTMENT—*Identification of Land—Land Books—Payment of Taxes.*— In an action of ejectment the plaintiff, in order to show that during a certain period he was claiming the land in controversy, may show· that during that period a tract of land, containing the same number of acres, lying the same distance from the court-house, and in the same direction from the court-house as the land in controversy, though in a different district, was listed to, and taxes thereon paid by the plaintiff, or those under whom he claims. It is for the jury to determine the weight of such evidence.

2. EVIDENCE—*Objections to Introduction of.*—An objection to the introduction of evidence should point out specifically the objectionable part. If part of the evidence objected to is proper and another part not, a general objection to all, not specifying the objectionable part should be overruled.

3. DEEDS—*Description of Land Conveyed—Extrinsic Evidence.*—Where land is conveyed by a general description, extrinsic evidence is admissible to ascertain the location of adjoining tracts called for, so as to apply the conveyance to its proper subject-matter. If with the aid of these the land granted can be sufficiently identified it is all that is necessary.

4. CONVEYANCE TO ONE "AS EXECUTOR"—*Legal Title on his Death Intestate.*—Where land has been conveyed to a grantee "as executor" of another, upon the death of the grantee, the legal title passes to his heirs, and they are the proper and only parties to maintain an action of ejectment for its recovery.

5. EJECTMENT—*How Plaintiff's Title Established.*—The plaintiff in an action of ejectment may show title in himself either by showing a grant from the Crown or the Commonwealth, and connecting himself therewith by a regular chain of title, or by showing such a state of facts as will warrant the jury in presuming a grant.

6. POWERS—*Naked Power—Power Coupled with an Interest—Death of Grantor.*—A power which is to be exercised in the name and as the act of the grantor of the power is said to be a naked power, and is revoked by the death of the grantor. But when the estate or interest on which the power is to be exercised passes with it, and vests in the donee of the power, he acts in his own name, and the power is coupled with an interest, and is not revoked by the death of the grantor.

7. POWERS—*Trustee in a Deed to Secure Debts—Conveyance by Personal Representative of Trustee.*—The power of sale conferred on a trustee in a deed of trust on real estate to secure a debt, is a power coupled with an interest, and is not affected by the death of any party to the deed. Formerly, if the trustee died, resort to equity was necessary either to substitute a new trustee, or to order a sale by an officer of the court. But if the deed expressly authorized a sale by the personal representative of the trustee, such representative could exercise the power of sale, though the estate or interest vested in the trustee descended and passed to his heirs. The deed of such personal representative, however, where a sale has been made by him in pursuance of the deed of trust, operated to divest the heirs of the trustee of the title or interest of the trustee in such land, and to invest the purchaser therewith.

8. POWERS—*Personal Representative of Trustee in Deed to Secure Debts—Recitals in Deed from such Representative as Evidence.*—The personal representative of a trustee in a deed of trust on real estate to secure the payment of a debt, though authorized to execute the trust upon the death of the trustee, is clothed with only a naked power, and his deed does not invest a purchaser from him with title unless the conditions exist which authorize a sale by him, and the sale is made in accordance with the terms of the trust. The burden of proving these facts is upon the party claiming under such deed, and the recitals of the deed, unless made so by statute, are not *prima facie* evidence of such facts.

9. ADVERSE POSSESSION—*Recitals in Deed—Presumptions in Support of Possession.*—Where actual possession of land has been taken and held under a deed for a sufficient length of time to bar a recovery by the original owner, supposing such possession to be adverse, the regularity of the proceedings as recited in the deed will be presumed in support of the possession.

10. ADVERSE POSSESSION—*Possession of Part Claiming the Whole—Color of Title—Claim of Title—Constructive Possession.*—Possession of a part of a tract of land claiming the whole under color of title thereto is possession of the whole, but a party can only be held to have color of title to lands embraced within his deed. Color of title necessarily implies that the party relying upon it must claim under something that has the semblance of title. Constructive possession

is limited to lands of which a party has color of title and does not extend to those of which he has a mere claim of right or title. A private survey or map, never recorded, nor referred to or made a part of the deed under which the party relying on it claimed, cannot be considered color of title. Possession under a claim of title, as distinguished from color of title, extends only to that portion of the land whereof the claimant is in the actual possession.

11. ADVERSE POSSESSION—*Conflicting Title—Possession of Part Claiming the Whole.*—Where there are conflicting titles, if the junior claimant settles within his boundary, but outside of the land in controversy, he gains no possession of the land in controversy whether the possession of the senior claimant be actual or constructive. Where there is no controversy, the rule that possession of a part claiming the whole is the possession of the whole applies, but where there is a conflict of title such possession is taken subject to the conflict. Without actual possession of some part of the land in controversy, the junior claimant can gain no possession of that subject against the better right of the senior claimant.

Argued at Richmond.    Decided at Wytheville.

Error to a judgment of the Circuit Court of Louisa county, rendered August 19, 1893, in an action of ejectment wherein the defendants in error were the plaintiffs, and the plaintiff in error was the defendant.

*Reversed.*

This was an action of ejectment to recover a tract of twenty-five acres, more or less, of land, in the county of Louisa. The evidence is sufficiently set forth in the opinion of the court. After the evidence had all been introduced, the plaintiffs and defendant each offered instructions. The plaintiffs asked six instructions, to the giving of which the defendant objected, but the court gave the first four, and refused to give the last two, numbered five and six. The defendant asked eleven instructions, the last six of which, numbered six, seven, eight, nine, ten and eleven, the court refused to give. The action of the court in giving the first four of the plaintiffs' instructions, and in refusing

to give the last six of the defendant's instructions, was excepted to by the defendant, and a bill of exceptions spread on the record. The instructions were as follows:

### *Plaintiff's Instruction No. 1.*

" The court instructs the jury that if they believe from the evidence that Wm. Grady was in 1810 lawfully seized and possessed of the twenty-five acres of land in the declaration mentioned, and that he then conveyed said land in trust to John Edwards, trustee, to secure a debt to George Pottie, and that Reuben Edwards, the adm'r of John Edwards, did in 1830, in the due and lawful exercise of his trust, convey said land to John Thompson, ex'or of George Pottie, and that the plaintiffs in this action are the sole surviving heirs-at-law of John Thompson, deceased, and that the said twenty-five acres of land are not embraced in the deeds from Mayberry and wife to Hunter & Stout, and from Hunter & Stout to Warren, President, &c.; from H. W. Murray, com'r, to Jordan, &c., and from Jordan's ex'or to Crenshaw; from Ira F. Jordan to Mrs. McClung, and from Mrs. McClung and said Crenshaw to said defendant, and were not conveyed or purported to be conveyed by said deeds, then you should find for the plaintiff, the land in the declaration mentioned, unless you should believe from the evidence that the defendant company or those under whom it claims, and has priority of title, has under claim of right or title held adverse possession of said lands or some part thereof for a continuous period of fifteen years before the commencement of this suit, not counting the time from the 17th of April, 1861, to the first of January, 1869.

" By adverse possession is meant an actual, exclusive, open, notorious, visible, hostile, and continuous possession or acts of ownership over the land and with claim of title thereto conformable to the nature of the land and the uses

to which it would naturally be put, but such acts as amount to mere trespasses exercised without restriction or hindrance, do not constitute adverse possession.   But you are further instructed that if you should believe from the evidence that the defendant held, by adverse possession, as herein defined, only a part of the land in the declaration mentioned, then such actual adverse possession of a part does not extend constructively the possession of the defendant to the whole tract, and the jury should find for the plaintiffs such part or parts of such tracts of land as they may believe from the evidence was not held adversely to the plaintiffs; provided they believe that the plaintiffs have shown title thereto, as set out in this instruction.

" And should the jury believe from the evidence that the defendant, or those under whom it claims, held a part of said tract of land by adverse possession as herein defined, at one time, and a part at another time, this in itself does not amount to adverse possession of the whole, although the sum of the periods for which the parts were so held adversely may amount to fifteen years, nor does it amount to adverse possession of any part which has not itself been so held adversely for said period of fifteen years."

*Plaintiffs' Instruction No. 2.*

"If the jury believe from the evidence that the firm of Stout & Hunter had no title of any sort to the land in controversy, and that William Stout never claimed any interest in said land except as a member of the partnership of Stout & Hunter, but that John Hunter was entitled to an interest for his life in said land in right of his wife, then the jury must attribute and refer any acts upon the part of Stout & Hunter or either of them tending to show user and occupancy of said land, to the real ownership of John Hunter in right of his wife, and during the continuance of the marital relations between John Hunter and his wife there was not and could

not be any adversary possession of said land on the part of said John Hunter against his wife in her lifetime, nor could there be any adversary possession of the said land on the part of said Hunter at any time after the death of his wife, against the other devisees of George Pottie, dec'd, or those claiming under them, without actual notice to the same of a disclaimer by said Hunter of any holding of said land in right of his wife, or without such unequivocal acts of possession of said land upon the part of the said Hunter continuing for fifteen years, open and public, making the possession so visible, hostile, exclusive and notorious that such notice may fairly be presumed."

### *Plaintiffs' Instruction No. 3.*

"If the jury believe from the evidence that Hunter & Stout did not own or ever themselves claim any title to the land described in the plaintiffs' declaration adversely or hostile to the plaintiffs, or those under whom the latter claim; and if the jury further believe from the evidence that the defendant claims title to said land as derived from the said Hunter & Stout, and by adversary possession, and in no other way, then the jury are instructed that whatever may have been the possession, user, or occupancy of the said land by the said Hunter & Stout, or by any of the parties operating the Victoria Furnace during their ownership of the latter, such mere naked possession not under any adverse claim of title cannot be tacked or added to any possession of the defendant, or of those under whom it claims, nor be computed in order to make up any period of adverse possession on the part of the defendant or those under whom it claims."

### *Plaintiffs' Instruction No. 4.*

"The jury are instructed that, in determining the location of the land conveyed by the deed from Young & Johnson to

Scott, they must be governed by the following rules: That marked corners and natural boundaries called for in the deed overcomes the calls for distances, and that if they believe from the evidence that the red oak now standing on the west of the road was the stooping red oak called for in the deed from Young & Johnson they must take that to be one corner of the land so conveyed by Young & Johnson, though the called for distance in such deed from Bond's corner be shorter than the actual distance from Bond's corner to such red oak, and so as to the line from the red oak North 21½° West if they believe from the evidence that Contrary Creek, as it is now located, is the creek called for in such deed, they must take that to be the end of the line last named, though the distance called for in such deed from the red oak to the creek be shorter than the actual distance necessary to reach the creek."

*Plaintiffs' Instruction No. 5.*

" The jury are instructed that if they believe from the evidence that the twenty-five-acre tract of land claimed by the plaintiffs was in March, 1810, the only land left to and owned by William Grady, and that it was bounded by the lands of William Mansfield from the red oak tree to the creek on one side and by the lands of Richard Johnson and James Young from the red oak tree to the creek on another side, then this location may satisfy the description as to bounds contained in the deed from William Grady to Edwards, trustee, viz. : Bounded by the lands of William Mansfield and Richard Johnson; provided, the preponderance of evidence in the case sufficiently identified the land in controversy as being in fact conveyed by said deed."

*Plaintiffs' Instruction No. 6.*

" The jury are instructed that in determining the location of the land conveyed by the deed from William Grady to Ed-

wards, trustee, no mere conjectural hypothesis as to its location is sufficient; but any hypothesis adopted by the jury must be supported by and be in accord with the preponderance of the evidence in the cause which bears directly or indirectly on this point."

### Defendant's Instruction No. 1.

" The possession by the defendant of the land in controversy is *prima facie* evidence of his title thereto. And in order to entitle the plaintiffs to recover in this action they must show that they have legal title to the land, and without such proof the jury must find for the defendant, whether defendant has any title or not."

### Defendant's Instruction No. 2.

" If the jury believe from the evidence that the defendant and those through whom the defendant claims, have had actual, adverse, exclusive, and continuous possession of the land in controversy under claim of title for fifteen years prior to the commencement of this suit, not counting the time from the 17th day of April, 1861, to the 1st of January, 1869, then they must find for the defendant, although they believe that the said land was conveyed by Reuben Edwards, administrator of John Edwards, deceased, to John Thompson, executor of George Pottie, deceased, by deed of the —— day of ———, 1830, offered in evidence by the plaintiffs."

### Defendant's Instruction No. 3.

" The court further instructs the jury that the exercise by the defendant, or those under whom it claims, of open, notorious and habitual acts of ownership over the land in controversy is sufficient evidence of possession, and it is not necessary to such possession that the land should be enclosed, or built upon, or actually cultivated or cleared."

*Defendant's Instruction No. 4.*

" If the jury believe from the evidence that the Victoria Mining and Manufacturing Company employed the county surveyor to make a survey and map of their property in the year 1866, and that such survey and map was made; and if they further believe that in the year 1867 Samuel F. and Ira F. Jordan became the purchasers of the entire capital stock of the said company, the said company delivering to them the said map as describing the boundaries of the land owned by it at the time of the sale; and if they also believe that the plaintiffs, or those under whom they acquired title, had not at that time actual possession of the land in controversy, and that Samuel F. and Ira F. Jordan entered upon the said land in the year 1867, after and in pursuance of their said purchase, and took and held actual possession thereof by improvement, cultivation, mining and taking of ores, cutting and taking wood or timber, or other open, notorious and habitual acts of ownership, and with claim of title, and that they and those claiming under them have together so continued the same for fifteen years before the commencement of this suit, not counting the time between 1867 and the first day of January, 1869, then the land in controversy is shown to be within those boundaries, the plaintiffs are, by force of the statute of limitations, barred from maintaining their action of ejectment, and the jury ought to find for the defendant."

*Defendant's Instruction No. 5.*

" If the jury believe from the evidence that when William Grady conveyed to John Edwards by the deed of the 1st of March, 1810, under which plaintiffs claim the tract of land therein mentioned, describing it as containing twenty-five acres, bounded by the lands of William Mansfield and

Richard Johnson, and being the land whereon the said Grady now lives, he, the said Grady, resided on the East side of the main county road from Tolersville to the Rattlesnake Den, and not upon the land in controversy, and that the land which he so conveyed was the land on which he resided and not the land in controversy, then they ought to find for the defendant, though they may believe that the land so conveyed did not belong to William Grady, but that he did own the land in controversy."

*Defendant's Instruction No. 6.*

"If the jury believe from the evidence that the Victoria Mining and Manufacturing Company employed the county surveyor to make a survey and map of their property in the year 1866 with the view of showing it to proposed purchasers in order that they might see the boundaries of the property; and if they further believe that in the year 1867 Samuel F, and Ira F. Jordan became the purchasers of the entire capital stock of said company, the said company delivering to them the map as describing the boundaries of the land owned by them at the time of said sale, and that on the 1st day of January, 1874, the conveyance was made by H. W. Murray, commissioner, under an order of the Circuit Court of Louisa, conveying the property of said company to said Jordans, and that the map has been delivered over to and held by each successive purchaser of the property down to the defendant, as describing the boundaries of the property sold, then if the land in controversy is shown within these boundaries, and the defendant and those through whom he claims have ever since the year 1867 had actual occupancy of the Victoria Furnace property, claiming and treating the land in controversy as a part thereof, they should find for the defendant."

*Defendant's Instruction No. 7.*

" The court instructs the jury that land can only be conveyed according to the description thereof, and if they believe that William Grady, at the time of this conveyance to Edwards, trustee, in 1810, resided on East side of the main county road from Tolersville, near Mineral City, to the Rattlesnake Den, and not upon the land in controversy, and that the land which he conveyed to Edwards, trustee, is described as the land upon which he resided, then they must find for the defendant, although they may believe that the land upon which he resided did not belong to him, but was claimed and owned by Young and Johnson, and that the land in controversy did belong to him, the said William Grady."

*Defendant's Instruction No. 8.*

" The court further instructs the jury that although they may believe that at the time William Grady made the conveyance referred to in the preceding instruction he did not own any land except the land in controversy, and that he intended to convey the land in controversy by said deed, but by mistake he conveyed land which he did not own, then the said deed was inoperative to convey the land in controversy, and they ought to find for the defendant."

*Defendant's Instruction No. 9.*

" If the jury believe from the evidence that the Victoria Mining and Manufacturing Company employed the county surveyor to make a survey and map of their property in the year 1866, and that in the year 1867 Samuel F. and Ira F. Jordan became the purchasers of the entire capital stock of said company, the said company delivering to them the map as describing the boundaries of the land owned by it at the time of the sale, and that the land in controversy is em-

braced within said boundaries; that on the 1st day of January, 1874, the conveyance was made by H. W. Murray, commissioner, under an order of the Circuit Court of Louisa, of the property of the company to the said Jordans, and that this map has been delivered over to and held by each successive purchaser of the property down to the describing the boundaries of the land sold, and if they further believe from the evidence that upon their purchase the said Jordans entered upon the land in controversy as their own, claiming title thereto, and exercised acts of ownership thereon by mining, cultivation, or otherwise taking the profits to their own use; and if they further believe from the evidence that the plaintiffs, or those under whom they claim, were not in actual possession of said land at the time of said entry and have never had such possession since, then the entry by the Jordans was a disseisin and ouster of the plaintiffs, or of those under whom they claim, from their legal or constructive possession of the entire land in controversy. And if they further believe from the evidence that the Jordans and those claiming under them have never abandoned or surrendered the possession of the said land, but for fifteen years prior to the institution of this suit, not counting the period between the 17th day of April, 1861, and the 1st day of January, 1869, have had the continued use and enjoyment of the same by open, notorious, and habitual acts of ownership thereon, then the jury ought to find for the defendant."

### Defendant's Instruction No. 10.

" The court instructs the jury that if they believe from the evidence that in the year 1866 the Victoria Mining and Manufacturing Company, with a view of selling its landed property in the county of Louisa, caused the same to be surveyed by the county surveyor of Louisa, and a plat to be made in accordance with said survey, and that in 1867 Sam-

uel F. and Ira F. Jordan purchased the whole of the capital stock of said company under written contracts with the owners thereof, and at the time of said purchase said plat and survey was delivered to said Jordans by the agents of said company as indicating the boundaries of the land owned by said company, and that the land in controversy is embraced within the boundaries indicated by said plat and survey; that thereafter said Jordans brought a suit in equity and had the legal title to said property conveyed to them in 1874 by H. W. Murray, commissioner, in pursuance of their purchase aforesaid; that after said purchase aforesaid said Jordans took possession of said property, claiming title to the whole of it as represented by said plat and survey: then the court instructs the jury that said Jordans took possession of said property under color of title. And the court further instructs the jury that if they believe from the evidence that after said Jordans had taken possession of said property under color of title as aforesaid, they, and those claiming under them, have for fifteen years prior to the bringing of this suit, exercised over any portion of the property embraced in said plat and survey, open, adverse, actual, exclusive, and continuous possession, claiming title to the whole, then the court instructs the jury that the plaintiffs are barred from any recovery in this action, and they must find for the defendant."

*Defendant's Instruction No. 11.*

" If the jury believe from the evidence that the defendant, or those under whom it claims, claimed the land in dispute for fifteen years prior to the beginning of this suit, excluding the time from the 17th day of April, 1861, till the 1st day of January, 1869, and that during said period of fifteen years the fence on the southern boundary of said land along the Jenkins line was kept up under an agreement between said defendant and those under whom it claims on the one hand

and the owners and occupiers of the Jenkins land on the
other, as the boundary between their respective lands, and
that during such time the defendant, or those under whom
it claims, exercised acts of ownership over the said land as
their occasions required, then they should find for the de-
fendant."

*Frank V. Winston, Christian & Christian* and *Leake & Car-
ter,* for the plaintiff in error.

*F. W. Sims* and *John Hunter, Jr.,* for the defendants in
error.

Buchanan, J., delivered the opinion of the court.

Upon the trial of this cause, which is an action of eject-
ment, the court permitted the plaintiffs, over the objection
of the defendant, to introduce in evidence extracts from the
land books of Louisa county showing that a tract of land
containing the same number of acres, and lying the same
distance from the courthouse, and in the same direction as
the land in controversy, was charged on the land books for
the purposes of taxation. From the year 1832 to the year
1873, inclusive, the land was charged in the name of George
Pottie's estate, and from the year 1874 to the institution of
this action it was charged to George Pettus. They were also
allowed to introduce in evidence tax tickets showing the
payment of taxes on the land so listed upon the land books.

One objection to this evidence was that the land was
charged upon the land books of a different district from that
in which the land in controversy was located, and as one of
the questions in the cause was the identity of the land sued
for, the evidence tended to mislead the jury. The evidence
was offered to show that the claimants of George Pottie's
estate had, during that period, made claim to the land and

paid taxes thereon. This action was brought for their ben-
efit, and they had the right to show that during that period
they were asserting their claim to, and paying taxes on, the
land in controversy.

The question whether the tract of land sued for and the
tract to which they had asserted claim, and upon which they
had been paying taxes, was the same tract, was for the jury.
The fact that it was taxed in a different district from that in
which the land in controversy was located, was a circum-
stance tending to show that it was not the same land, but
was not conclusive of it, and was no sufficient reason for ex-
cluding the evidence from the jury.

Another objection made to the extracts from the land
books is that they contained the following statement: " In
1871 Pottie, Geo. E., 25 acres Con. Creek, N. E. 12. Subse-
quently Geo. E. Pottie's name was dropped and the name of
Geo. Pettus appeared with the same number of acres, loca-
tion, bearing and dis. from C. H. as above. It is believed
that this is the Geo. E. Pottie land."

The statement was made in the land book in the year
1890, after the controversy in this case had arisen. The
last sentence in it is a mere expression of an opinion, not a
statement of fact, and was clearly inadmissible. If the
court's attention had been called to the statement it would
doubtless have excluded it, but the objection made, as shown
by the bill of exceptions, was to " all and each of said ex-
tracts and receipts."

This objection being general, the court properly overruled
it, as the extract, except the statement complained of, was
clearly admissible in evidence. The objection to exclude was
too broad. *Kincheloe* v. *Tracewells,* 11 Gratt. 587, 600–1.

The party objecting ought to have pointed out specifically
the objectionable part, so that the court might have excluded
it, and allowed the residue of the extract to go to the jury.

The assessor, who made the statement complained of, was,

during the progress of the trial, examined as a witness. He explained the circumstances under which the statement was made, so that the jury had all the facts upon which he based his opinion. It is scarcely possible that his expression of opinion could have prejudiced the defendant under the circumstances, but if it did, having failed to make the proper objection in the court below, it cannot make it here now for the first time. *Warren* v. *Warren, ante* p. 73.

The assignment of error that the description of the land intended to be conveyed by the deed from Cosby to Dear, made in the year 1785, is so vague and indefinite that no title passed by it, cannot be sustained. The deed describes the land as one " certain tract or parcel of land situate, lying, and being in the county of Louisa, on the north fork of Contrary River, being a part of the land I purchased from Barrett Mitchell, the lower end of the said tract, joining the lands of Thomas Bond, John Timberlake, William Cliff, and my own that was taken from the said tract of land here described sold by the said Charles Cosby to Charles Dear, containing by estimation two hundred and thirty acres, be the same, more or less," &c. It is true that the deed does not describe the land by courses and distances, but it is described as lying in Louisa county, on the north fork of Contrary River, as a part of the land conveyed by Barrett Mitchell to Cosby, and that it adjoins the lands of Bond, Timberlake, Cliff, and the grantor.

Extrinsic evidence was admissible to ascertain the location of the adjoining lands called for, so as to apply the deed to its proper subject-matter. If, with the aid of such evidence, the land could not be identified, then the plaintiffs must fail in their action; but the deed upon its face, is not so defective in the description of the land as that the court could pronounce it ambiguous or uncertain, and exclude it from the jury. No court is at liberty to pronounce an instrument ambiguous or uncertain until it has brought to

and in its interpretation all the lights afforded by collateral facts and circumstances which are properly provable by parol. 1 Greenleaf on Ev., secs. 298 and 300. The court properly admitted the deed in evidence.

The plaintiffs in the action are the heirs of John Thompson, deceased, who sue for the benefit of the claimants of the unadministered estate of George Pottie, deceased. Thompson was the executor of Pottie, and it is claimed that at a trustee's sale of a tract of land which the evidence tends to show was the land in controversy, he became the purchaser. The deed conveying the property to him describes him as the executor of George Pottie. Whether he purchased the property in his own right, or for the benefit and for the purpose of saving the debt of his testator's estate, is immaterial, In either event he was invested with such title to the property as passed by his grantor's deed. Upon his death it descended to his heirs-at-law, to be held by them as trustees for Pottie's estate, if it was purchased by their ancestor for the benefit of that estate; for their own benefit, if purchased for himself. In any action at law for the recovery of the land, the heirs of John Thompson, assuming that the legal title passed by the deed to him, whether they sued for themselves or for the benefit of the estate of Pottie, were the proper and only parties who could sue. In an action of ejectment the holder of the legal title, as a rule, alone can sue. If the property was purchased for the benefit of Pottie's estate, and to save the debt secured by the trust, it will be dealt with in a court of equity as personal estate, but in a court of law it is real estate.

Another ground of objection relied on is that the plaintiffs failed to trace their title back to the Commonwealth, or further back than the year 1765. It was necessary for the plaintiffs to show that they had legal title to the land in controversy. This might have been done by showing a grant therefor from the Crown or Commonwealth, and by con-

necting themselves therewith by a regular chain of title. This could not be done, it was claimed, because of the destruction during the late war of the records of Hanover county, from which Louisa county was formed. It might also have been done by showing such a state of facts as would warrant the jury in presuming a grant. The evidence tended to prove that those under whom the plaintiffs claimed had taken possession of the land under, at least, color of title, and held it for many years.

A number of deeds were offered in evidence for a tract of land of which the land in controversy was claimed to be a part. The first deed offered in evidence was from Garrett to Pryor in 1765. Pryor conveyed to D. Smith in 1768; D. Smith to William Smith in 1770; William Smith to Mitchell in January, 1779; Mitchell to Cosby in October, 1779; Cosby to Dear in 1785; and Dear to William Grady in 1786. Each of these conveyances, except the first, shows that possession of the land was delivered by each vendor to his vendee. In 1810 Grady executed the deed of trust to Edwards, trustee, to secure Pottie. The evidence tends to show that Grady was in the possession of the land when he died, during or soon after the close of the war in 1812, and that the parties under whom the plaintiffs claim were in the possession of the land from the year 1768 to the year 1812, or 1813, a period of some forty-five years.

The evidence of possession, and the destruction of the records were sufficient to warrant the jury in presuming a grant for the land in controversy to Garrett, or those under whom he claimed.

One of the links in the plaintiffs' chain of title was a deed from Reuben Edwards, administrator of John Edwards, trustee in the deed of trust executed by Wm. Grady, to secure a debt due George Pottie. Whether or not the grantor in the deed of trust was dead when the sale was made under the trust in the year 1813 does not clearly appear.

He was dead in 1830, when the deed to the purchaser at the sale was made. It is contended that, upon the death of the trustee in the deed of trust, the legal title to the trust subject descended to his heirs, and that the power to sell passed to his personal representative by the terms of the deed of trust; that this power of sale being a naked power, not clothed with an interest, and not having been exercised during the lifetime of the grantor, the power to sell was revoked by his death, and that any sale or conveyance made thereafter by the personal representative of the trustee was a nullity.

It is true in the case of a mere naked power that it dies with the donor, and cannot be exercised after his death, although it may have been irrevocable during his life; but this consequence only follows in those cases where the power is a naked power, and is to be exercised in the name and as the act of the person who granted the power. Where the power is coupled with an interest so that it may be exercised in the name and as the act of the donee of the power, the death of the person who conferred the power has no effect upon it.

The reason given why the death of the donor revokes the power in the one case, and not in the other, is that in the case of a naked power, the interest or title being vested in the person who confers the power, it remains in him and can only pass out of him by a regular act in his own name. The act of a donee of a naked power, to be effectual, must be the act of the principal, done in his name, and be such an act as the principal himself would be capable of performing at the time the act was done. When the principal dies (being incapable thereafter of performing any act himself) all powers which he has conferred upon others, and which must be exercised in his name as principal are of necessity revoked. Such powers die with him; for it would be an absurdity to allow an act to be done in the name and

as the act of a principal, who was dead when the act was done—to allow an agent to do for him and in his name what he had no power to do for himself. Story on Agency, section 488.

But where the estate or interest upon which the power is to be exercised passes with it, and vests in the donee of the power, he acts in his own name. The estate or interest being in him, he can convey it in his own name, He is not a substitute, acting in the name and place of another, but is a principal acting in his own name, by virtue and in pursuance of powers which limit his estate or interest. In such a case the reason which limits the power to the life of the person giving it no longer exists, and the rule ceases with the reason upon which it is founded.

In *Hunt* v. *Rousmanier*, 8 Wheat. 174, an attorney in fact was invested with authority to sell a brig at sea, and pay the proceeds to the creditor. It was held in that case, Chief Justice Marshall delivering the opinion of the court, that the death of the principal revoked the power of attorney, although it was irrevocable in his lifetime by reason of the interest of the creditor in its execution. The power was to be exercised in the name of the principal and this could not be done after his death.

In the same case, when it was decided in the trial court, Mr. Justice Story said: "When it is said that a naked power is extinguished by the death of the person creating it, the language is meant to be confined to those cases in which, as in the case now before the court, the power is to be executed in the name and as the act of the grantor, and not of the grantee." 2 Mason, 244.

In the case of *Washington University* v. *Finch*, 18 Wall. 106, a deed of trust had been executed before the late civil war to secure a debt. The grantors were residents of and lived in one of the Confederate States. The property was located, and the trustee lived, in the State of Missouri. A sale was

made during the war. It was claimed that the power was revoked by the war. The Supreme' Court of the United States denied this, and held that the power under which the sale was made " was irrevocable."

In *Berry* v. *Skinner*, 30 Md. 567, it was held that the power of sale given in a mortgage was not revoked by the insanity of the mortgagor; that neither his insanity nor death would in any manner interfere with the mortgagee's right to execute the power of sale in the mode and manner stipulated by the parties, and the reason given was that a power " coupled with an interest so that it can be executed in the name of the donee or trustee is irrevocable."

Washburn, in his work on Real Property, Vol. 2, side page 499, in discussing the power of sale given in a mortgage, says that " such a power is coupled with an interest, and is appendant to the estate and irrevocable. It consequently passes with the estate by assignment, nor does it die with the mortgagor."

In *Hunt* v. *Rousmanier*, cited above, Chief Justice Marshall said: " We know that a power to A to sell for the benefit of B engrafted on an estate conveyed to A may be exercised at any time, and is not affected by the death of the person who created it."

In Perry on Trusts, sec. 602, it is said: " It is a universal rule that a power coupled with an interest is irrevocable, and as a power of sale inserted in a mortgage or deed of trust to a creditor to secure a debt, or to a third person for his benefit, is a power coupled with an interest, it cannot be revoked by any act of the grantor or donor of the power, not even the death or the insanity of the grantor or donor will annul or suspend its exercise. The debt remains, the right or lien on the property remains, and the power is coupled with them. In other words, the power is annexed to the property, and is an irrevocable part of the security and goes with it."

The power of sale conferred upon a trustee in a deed of trust being irrevocable, the death of no one, nor all of the parties to it, could affect the right of the creditor or his personal representatives to have the power of sale enforced. If the trustee died before executing the power of sale, and there was no provision made in the trust for some other person to exercise that power, resort to a court of equity would have been necessary, as the law was at the time the deed of trust in question was executed, for the appointment of another trustee, or to have a sale made by a commissioner of the court. In either case, however, the sale when made, must, as far as practicable, be in the manner and upon the terms prescribed by the deed of trust. *Crenshaw* v. *Siegfried,* 24 Gratt. 272, 279.

In the deed of trust under consideration, to avoid the necessity of resorting to a court of equity, if the trustee died before executing the power conferred upon him, the trust expressly conferred the power of sale upon his personal representative.

The fact that the power to sell and the estate or interest coupled with it were afterwards separated, the power passing by the terms of the trust to the personal representative of the trustee, and the estate or interest descending to his heirs, did not revoke the power of sale any more than it reconveyed the estate.

Although the personal representative of the trustee was not clothed with the estate or interest conveyed by the deed of trust, a sale by him, if made in pursuance of the deed of trust, would divest the heirs of the trustee of the title or interest, and invest the purchaser therewith by virtue of the provisions of the deed of trust, and the deed of the personal representative to the purchaser. *National Webster Bank* v. *Eldridge,* 115 Mass. 424, 428; *Carrington* v. *Goddin,* 13 Gratt. at page 601, &c.

In the case of *White* v. *Stephens,* 77 Mo. 452, where the

deed of trust provided that, in the case of the absence, death, refusal to act, or disability in any wise of the trustee named therein, the then acting sheriff of the county should, at the request of the holder of the note secured, sell the property, and execute a deed to the purchaser. The condition upon which the sheriff was authorized to sell having arisen, he sold and conveyed the property. The validity of his sale was attacked, but the court said: " In the case at bar, the title passed from the grantor to the trustee named in the deed of trust, as a security for the debt, and was subject to be divested upon the execution of the power by the sheriff, and the conveyance of the sheriff was not required to be made in the name of the grantor in the trust deed, and the well known rule announced in *Hunt* v. *Rousmanier,* that an attorney in fact cannot execute a conveyance in the name of his principal after the death of the principal, is therefore inapplicable here." The validity of the sheriff's sale and conveyance, which were made in pursuance of the trust, was sustained. See *Beal* v. *Blair,* 33 Iowa, 318, 321; *Clark* v. *Wilson,* 53 Miss. 119, 128–9.

We do not think that the power of sale was revoked by the death of the grantor in the deed of trust, but continued in full force for the benefit of the creditor whose debt was secured by it.

The personal representative of the trustee sold and made a conveyance.

His deed recites that the conditions upon which he was authorized to sell had arisen, and that the sale was made in pursuance of the trust. Objection was made to the introduction of this deed in evidence, and afterwards a motion was made to exclude it, upon the ground that it was made in the exercise of a naked power; that there was no evidence that a sale was ever made under the trust; and that the recitals in the deed were not evidence of the facts recited.

The trustee in a deed of trust takes a legal, though a de-

feasible title, and a deed from him to a purchaser conveys an absolute estate in a court of law, whether the conditions of the trust deed have been complied with or not, though a different rule prevails in a court of equity. *Taylor* v. *King*, 6 Munf. 358; *Harris* v. *Harris*, 6 Munf. 367; *Powell* v. *Taylor*, 10 Leigh 172, 183.

But the personal representative of the trustee being clothed with a naked power, not coupled with an interest, and his right not being absolute but conditional, his deed would not invest a purchaser from him with title unless the conditions existed upon which a sale was authorized, and the sale was made in accordance with the terms of the trust. The burden of proving these facts was upon the party claiming under the deed, and the recitals in the deed, unless made so by statute, were not *prima facie* evidence of the existence of such facts.

Few principles of law are more firmly settled than that in the case of a naked power, not coupled with an interest, the law requires that every prerequisite to the exercise of the power should precede it; that when the validity of a deed depends upon acts *in pais*, the party claiming under it is bound to prove performance of those acts; and that unless there be some statute making the recitals in the deed of the person making the sale *prima facie* evidence of the regularity of the proceedings, the acts *in pais* relied on to sustain the sale must be proved by evidence *aliunde*. *Flanagan* v. *Grimmett*, 10 Gratt. 421, 425–6, and cases cited; *Walton* v. *Hale*, 9 Gratt. 194, 197–98; *Reusens* v. *Lawson*, 91 Va. 226, 236; *Deputron* v. *Young*, 134 U. S. 241, 256–7.

The case of *Robinett* v. *Preston*, 4 Gratt. 141, is relied on as authority for dispensing with such proof. That was a sale of land by a sheriff under an execution. Actual possession had been taken and held by the party claiming under the sale and deed of the sheriff for a sufficient length of time to bar a recovery by the original owner, if the possession could

be considered adverse to his title.   In that case, to support
the possession, the presumption of the regularity of the
proceedings was allowed, but in this case no such possession
is shown; there is no evidence in the case that the plaintiffs,
or those through whom they claim, ever took actual posses-
sion of the land under that deed.   The sale purports to have
been made in 1813.   The deed was made in 1830.   This
action was brought in 1890.   No possession under it is shown.
To  hold  that the  recitals in that deed  are *prime  facie* evi-
dence  of  the  existence  of  the  facts  recited  under  these  cir-
cumstances would  violate  every  principle  of  law  applicable
to deeds executed under a naked power.

The motion  of  the  defendant  to  exclude  ought  to  have
been sustained.

The eighth bill of. exceptions is based upon  the action of
the  court in giving four instructions asked for  by the plain-
tiffs, and  in refusing  to give five of  the eleven instructions
asked for  by the defendant.

Whether  the action  of  the court in  giving the plaintiffs'
instruction numbered one, and in refusing to give the defend-
ant's instructions numbered nine and ten was correct or not,
depends upon  the  question whether the  defendant's posses-
sion  of  the  land  in  controversy was  under color  of  title, or
only under claim of right or title.

The  defendant  claimed  the  land  in  controversy  under a.
deed which  conveyed  a certain tract of  land  known as the
Victoria  Furnace  property.   The  metes  and  boundaries  of
the  land  conveyed were  not  set out, but it was described as
the  same land  which  Crenshaw  and  others, the  vendors of
the  defendant,  had  purchased from  Jordan  and others, and
which  the  last named  parties  had  purchased in  a chancery
cause,  and which  had  been  conveyed  to  them  by  a  commis-
sioner  of  the  court,  and to these deeds reference is made in
the  deed to  defendant.   The land  conveyed to  the  defend-
ant was  described to be  the  right, title, and  interest of  the

vendors in and to the said Victoria Furnace property, as set forth and described in said deed from Henry W. Murray, special commissioner, &c. The land in controversy is not covered by the deed to the defendant, nor by the deeds of those under whom he claims. The evidence tends to show that, in the year 1866 or 1867, the then owners of the Victoria Furnace property had a survey made of the property claimed by them, and that the land in controversy was embraced within that survey; that the land in controversy had, prior to that time, been treated and used as a part of the Furnace property; that the purchasers of the land had been shown the survey and plat in question as showing the boundaries of the Furnace property before they purchased, but no reference was made to it in any of the conveyances of the Victoria Furnace property, nor was it ever conveyed by the metes and boundaries of the survey and plat referred to.

The evidence also tended to show that, after the survey and map were made, the subsequent owners of the Furnace property claimed the land in controversy as a part of the Furnace tract and exercised acts of ownership upon it; but the evidence as to the continuity and extent of these acts of ownership is conflicting. During this period there is no pretense that the plaintiffs had actual possession of any part of the land in controversy.

Upon this state of facts, or rather upon the evidence tending to show these facts, the defendant claimed that it had color of title to the land in controversy, and that its possession of part of the land was possession of all the land claimed by it, including the land in controversy.

The deed of the defendant, as stated above, did not embrace the land in controversy. While the description was general, and the metes and boundaries were not given, the deed referred to the prior conveyances of the same property and under which the defendant claimed, and it is limited to the lands covered by and embraced in those deeds. The

survey and plat made by the owners of the Victoria Furnace property in 1866 or 1867, not having been made a part of the subsequent conveyances of the property, and the land not having been conveyed by the metes and boundaries given in that survey and plat, they cannot be looked to in ascertaining what land was covered by the defendant's deed. They are not parts of the deed, and parol evidence in a court of law is not admissible to show that land not embraced in the deed was intended to be conveyed by it. To allow this would violate the settled rule that the terms of a writing cannot be contradicted or varied by verbal evidence. If there was a mutual mistake in the execution of the deed, it must be corrected by consent or in a court of equity, and until so corrected the rights of the parties are limited by the deed as written.

The defendant must be held to have color of title only to the lands embraced within its deed. Color of title necessarily implies that the party relying upon it must claim under something that has the semblance of title. A private survey and map, never recorded, not referred to or made a part of the deed under which the party relying on it claimed, cannot be considered color of title. *Creekmur* v. *Creekmur*, 75 Va. 430, 438–40; *Shanks* v. *Lancaster*, 5 Gratt. 101; Angell on Lim., sec. 404; Sedgwick & Waite on Trials of Title, &c., secs. 762, 772; Hutchinson's Land Titles, sec. 389.

The survey and map were proper evidence to show the character of the defendant's claim of right or title. If it and those under whom it claims were continuously in adverse possession of the whole, or any part of the land in controversy, for the statutory period prior to the institution of this action, then its title to the land to the extent that it and those under whom it claims had occupied, cultivated, enclosed, or otherwise excluded the owner from it, became perfect; but, if such occupancy did not extend to the whole of the land in controversy, its possession would be limited

to the land so held, and could not be extended to the residue of the land in controversy, as would have been the case if the possession had been taken and held under color of title, instead of claim of right or title only.

Instruction No. one, given by the court at the request of the plaintiffs, was framed in accordance with the foregoing views, correctly stated the law, and was properly given. The defendant's instructions Nos. nine and ten, being in conflict with these views, were properly refused.

But if the survey and map, under the facts of this case, could be held to be color of title, so that the possession of part of the land in controversy would have been the possession of the whole, no injury resulted to the defendant from the action of the court in its rulings upon the said instructions numbered one, nine and ten.

The jury were of the opinion that the defendant and those under whom it claimed had not been in the adverse possession of any part of the land in controversy for fifteen years prior to the institution of this suit. Being unable to show that it had perfected its title to any part of the land in controversy by adverse possession, no harm could possibly have resulted to it from the court's refusal to instruct that a possession of part of the land in controversy was a possession of the whole, for if the court had so instructed, the result would have been the same in the view the jury took of the evidence.

The long continued possession of the defendant, and those under whom it claims, of the Victoria Furnace property proper, that is, of the land it claimed, outside of the land in controversy, could not be regarded as possession of the land in controversy, even if its title papers covered, as they did not, the land in controversy.

Where there are conflicting titles, if the junior claimant settles within his boundary, but outside of the interlock or land in controversy, he gains no actual possession of the land

in controversy, whether the possession of the senior claimant be actual or constructive only. Where there is no controversy, the rule that possession of the part is possession of the whole, is to be taken in reference to the entire tract, but where there is a conflict of title it is to be taken in reference to such conflict. Without actual possession of some part of the land in controversy, the junior claimant can gain no possession of that subject against the better right of the senior claimant. If the law were otherwise, as was said by Judge Baldwin, the lawful owner might be disseised, not only without his knowledge, but without the means of acquiring it. *Taylor* v. *Burnsides*, 1 Gratt. 169, 200 (side page 196.)

Without discussing in detail the action of the court in giving and refusing the other instructions given and refused, it is sufficient to say that under the facts of this case, the rulings of the court upon these instructions were correct.

The judgment of the Circuit Court must be reversed, and the cause remanded for a new trial to be had in accordance with this opinion.

*Reversed.*