# Richmond.

## HARDY v. COMMONWEALTH.

March 10, 1910.

Absent, Buchanan, J.

1. CRIMINAL LAW—*Venire Facias—Summoning Entire List.*—Where the order for a writ of *venire facias* in a felony case conforms to the requirements of section 4018 of the Code, both as to the number of names to be drawn and the number of persons to be summoned, the writ will not be quashed merely because it directs the sheriff to summon the entire list drawn, instead of four less than that number, in the absence of any evidence that the accused was, or could have been prejudiced thereby.

2. CRIMINAL LAW—*Venire Facias—Code Section 4018—Number of Jurors to be Summoned.*—The provision of section 4018 of the Code requiring that the number of persons drawn from the box in a felony case should not be more than four in excess of the number to be summoned, was clearly not intended as a protection to the party to be tried, but to give the sheriff a certain discretion to be used if he did not summon all the jurors drawn, provided the number not summoned did not exceed four.

3. CRIMINAL LAW—*Trial for Murder—Evidence—Ill Feeling of Deceased—Communication to Accused.*—On a trial for murder, it is entirely proper and material to show that the purpose of the deceased to prosecute the accused for a violation of the criminal laws of the State was communicated to the accused before the murder of the deceased.

4. CRIMINAL LAW—*Murder—Evidence—Feelings of Parties Toward Each Other—Purpose of Deceased—Partial Communication to Accused.*—On a charge of murder, it is proper to introduce in evidence facts which tend to show the state of feeling existing between the deceased and the accused, and that it was the settled purpose of the deceased to have the accused prosecuted and punished for a violation of the criminal laws of the State, although all that was said to the witness was not communicated to the accused.

5. CRIMINAL LAW—*Evidence—Conditional Threats.*—On a charge of murder, conditional threats made by the accused are admissible in evidence wherever it is shown that the deceased had put himself within the condition laid down by the accused. It is not necessary that the person killed should have been named, when the facts and circumstances make it clear that he was the party intended.

6. CRIMINAL LAW—*Evidence—Indefinite Threats.*—Upon proof of indefinite threats, as that the accused "was going to kill him," without naming anyone, it is for the jury to determine from all the facts and circumstances to whom the threat referred.

7. CRIMINAL LAW—*Evidence—Admissibility—General Objection.*—A general objection to testimony, some of which is proper and some not, should be overruled.

8. CRIMINAL LAW—*Circumstantial Evidence—Latitude in Presentation.* Where the evidence to identify an assassin is purely circumstantial, greater latitude is allowed in its presentation than if it were direct and positive. The jury should have before them every fact which will enable them to come to a satisfactory conclusion.

9. CRIMINAL LAW—*Evidence—Express Threats—Impersonal and Conditional Threats.*—Where definite, express, personal and malignant threats have been proved to have been made by one indicted for murder, with direct reference to the deceased, evidence of other impersonal and conditional threats, and of the ill-feeling existing between the deceased and the accused should be allowed to go to the jury, to be considered by them, along with other threats proved in the case, and given such weight in connection therewith as the jury think it deserves.

10. CRIMINAL LAW—*Evidence—State of Feeling Between Parties—Circumstantial Evidence of Guilt of Accused.*—Evidence as to the state of feeling existing between the accused and the victim of a murder is not restricted to cases where it has been shown that the accused committed the crime. It may also be received where the evidence tends to prove that the accused was the perpetrator of the crime.

11. CRIMINAL LAW—*Murder—Evidence to Show State of Feeling Between Deceased and Accused.*—On an indictment for murder, evidence of a detective that the deceased, shortly before his death, employed him to hunt up evidence that accused was selling liquor illegally, with a view to prosecuting the accused therefor, but that he found none, is admissible for the purpose of showing the state of feeling existing between the deceased and accused.

12. EVIDENCE—*Books of Original Entry—When Admissible.*—A book of entries, in which an entry is made in the usual course of business, at the time of the transaction, of matters within the personal knowledge of the bookkeeper, is admissible in evidence to

show to whom goods were sold, where the bookkeeper is beyond the jurisdiction of the trial court.

13. CRIMINAL LAW—*Witnesses—Surprise—Prior Inconsistent Statements—Code, Section 3351.*—Under the provisions of section 3351 of the Code (1904), a witness introduced by the Commonwealth having turned out to be adverse, and his evidence having taken the Commonwealth by suprise, it was proper, after laying the foundation therefor, to prove a prior inconsistent statement made by him, and to instruct the jury that his evidence, so far as it contradicted any statement of any witness introduced by the defense, was proper rebuttal, and that the evidence of his prior inconsistent statement only went to his credibility, and affected his veracity and truthfulness.

14. CRIMINAL LAW—*Misconduct of Jury—Attending Picture Show.*—A verdict of guilty in a murder trial will not be set aside simply because the jury in charge of officers of the court were permitted to attend a moving picture show of a somewhat tragic character, but bearing no similarity to the case on trial, and where the jury could not possibly have been affected or influenced by seeing it. It is indiscreet, however, for officers of the court in charge of the jury to attend such performances, even though they occupy a separate gallery and have no communication whatever with outsiders, and such conduct is highly censurable.

15. CRIMINAL LAW—*New Trial—Facts Known to Counsel During Trial—Failure to Object.*—A prisoner cannot go forward with the trial of his case and take his chances of success, and, after he has been found guilty, seek a new trial on the ground that the jury attended a moving picture show, when his counsel knew that they had attended the show before the case was submitted to them, and yet, with that knowledge, raised no objection to their alleged misconduct.

16. CRIMINAL LAW—*Evidence—Alibi—Use of Unsatisfactory Evidence—Effect.*—Where circumstantial evidence tends strongly to prove that the prisoner is guilty of the murder of which he is accused, his effort to prove, by unsatisfactory evidence, an *alibi*, or that he was not the owner of the gun with which the murder was committed, at the time of its commission, leaves him in a worse condition than if he had not made the effort.

17. CRIMINAL LAW—*Evidence—Conduct of Accused.*—The conduct of one accused of crime, after its commission becomes known, is a circumstance to be considered on his trial for the crime.

18. CRIMINAL LAW—*Conflicting Evidence—Verdict.*—Although the evidence in a criminal case presents conflicts and inconsistent statements of witnesses, the jury are the sole judges of the facts which the evidence tends to prove, and of the inferences and conclu-

sions to be drawn therefrom, and their verdict will not be set aside unless it is against the law, or is contrary to the evidence, or is without evidence to support it.

Error to a judgment of the Circuit Court of Nansemond county.

*Affirmed.*

The opinion states the case.

*Thos. H. Willcox* and *Hill Carter,* for the plaintiff in error.

*Wm. A. Anderson, Attorney General,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

Samuel Hardy was indicted in the Circuit Court of Nansemond county for the murder of Tiberius Gracchus Jones (spoken of in the record as "Grac." Jones), was found guilty of murder in the first degree, and sentenced to be electrocuted. To this judgment of the circuit court a writ of error was awarded by a judge of this court.

It appears that the deceased, in company with his next door neighbor, one J. H. Joyner, returned on the railroad train, from a trip to Suffolk, to the town of Holland, near which town in Nansemond county he lived, a little after nine o'clock P. M. October 26, 1908, and after lingering a short time in Holland near the office of a justice of the peace, who was engaged in the trial of a criminal case, he and Joyner left for their homes, walking together till the pathway or road to Joyner's home was reached, and then the deceased proceeded in the direction of his own home near by. About 10:30 o'clock P. M., just after deceased had gotten inside his inclosure, entering through what is generally spoken of as the eastern gate, he was shot down by some person or persons lying in wait, receiving two wounds in the abdomen, made with No. 6 shot fired from a shotgun at short range, and three wounds made by bullets fired from a

pistol.  The shots from both the gun and the pistol were in rapid succession, and both wounds were necessarily fatal, and from them the murdered man died within two or three hours.

Joyner, who was not far away, and who not only heard the shooting, but heard the deceased exclaim "You scoundrel!" was the first person to reach the deceased, who exclaimed as he approached, "Joyner, they have killed me for telling the truth," and afterwards remarked, that he thought "Sam Hardy or Luke did it."  Still later, when conscious of impending and certain death, he said, that "it was so dark that he could not see, but thought it was Sam Hardy."

The physicians attending the wounded man did not find either of the pistol bullets in the body of the deceased, but did find in one of the wounds the wad of a cartridge which bore upon it the stamp of the Union Metallic Cartridge Co., "No. 6 shot, 3 drams powder," just such a wad as was used in shells shot from a No. 12-bore Ithaca shotgun, and just such a gun as Sam Hardy, the accused, owned and had in his possession certainly up to a few days before this murder.  The pistol used by the assassin was, as near as could be told from the wounds it made, a 32 calibre, just such a pistol as the accused owned, and as was shown to have been put by him into his pocket on the night of the murder as he was leaving his store, and not over two hours before the murder.

It further appears that the accused and the deceased, who had lived for some years within less than a mile of each other, had been friends until within a few months before the murder of the deceased, when they became exceedingly unfriendly, in fact, bitterly hostile; the deceased having charged the accused with selling liquor without a license, and openly and in unqualified terms charged him with perjury in the testimony which he had given in a will case just six days previous to the murder of the deceased; and that deceased had not only declared it to be his purpose to prosecute the accused for the illicit sale of liquor, but also for perjury, and had on the very

day he was assassinated gone to Suffolk to consult an attorney with respect to the institution of such prosecutions. It also appears, as we will see later, that the accused knew what were the declarations and purposes of the deceased in respect to his prosecution for illicit traffic in liquor, but what was very much more serious to him a prosecution for perjury, and he doubtless knew that the charge of perjury could not be maintained without the evidence of the deceased.

It was furthermore shown in the evidence that the accused (Hardy) cherished feelings of intense hostility towards the deceased for some time prior to his death; and that he had made repeated and malignant threats against his life.

Early in the morning following the murder there was found near where the deceased had fallen and was lying when Joyner found him, the forearm of a Ithaca shotgun, which had doubtless bounded from the gun which fired the fatal shots at the deceased—a forearm of just such a shotgun as the accused owned.

Taking up in their order the errors assigned on behalf of the accused, we come first to the question whether or not the trial court erred in overruling the motion of the accused to quash the writ of *venire facias.*

Pursuant to the statute (section 4018, Code 1904) the judge of the circuit court directed more than twenty names to be drawn and placed in the list, and more than sixteen to be summoned—i. e., the order entered, "for good cause shown," directed that forty persons be drawn, at least thirty-six of whom should be summoned. Thereupon the clerk issued the writ of *venire facias,* directing the sheriff to summon the entire forty so drawn, and the failure of the clerk to direct the summoning of thirty-six instead of the entire forty is the ground of the motion of the accused to quash the writ.

That part of section 4018 of the Code, *supra,* which is pertinent here is as follows: "For good cause shown in any felony case the judge of the court, in term time or vacation, may di-

rect more than twenty names to be drawn and placed in the list, and more than sixteen persons to be summoned. He shall in such case specify the number of names to be drawn and the number of persons to be summoned; the number drawn shall not be more than four in excess of the number to be summoned."

That the clerk in this case proceeded strictly in the manner prescribed in the statute to draw forty names from the jury box, which he placed in the list which he delivered to the sheriff, is not questioned. Therefore the sole question is, was the issuing by the clerk of the writ of *venire facias* directing the sheriff to summon the entire list so drawn such a departure from the mandatory and imperative requirements of the statute as prejudiced, or might have been prejudical to, the accused.

The motion to quash the writ was made in due time, but it is nowhere pointed out that the accused was or might have been prejudiced by the writ directing the summoning of the entire forty instead of only thirty-six of the persons named in the list; nor does there occur to us any reason for supposing that this irregularity of the clerk, if indeed it could be considered an irregularity, could have by any possibility been prejudical to the accused.

To sustain the contention of the accused, the case of *Jones* v. *Commonwealth,* 100 Va. 842, 47 S. E. 951, and *Hoback* v. *Commonwealth,* 104 Va. 871, 52 S. E. 575, are greatly relied on, but in our view of those cases they are not authority for the proposition the accused is contending for. In the first of those cases the clerk issued a writ of *venire facias* commanding the officer to summon twenty-four persons of his county, instead of sixteen as the statute and the order of the court required; and it was held that the mandatory and imperative provisions of the statute had not been complied with, and that the writ of *venire facias* should have been quashed. Subsequently the statute was amended, with the evident intent of reducing technical objections in criminal cases to the minimum. See Acts 1902-3-4, p. 882; Acts 1904, p. 16.

In the *Hoback Case, supra,* the method actually followed in summoning the *venire* was in direct contravention of the mandatory provisions of the statute for the protection of the prisoner, and a guaranty to him of a jury uninfluenced by the will, caprice, or personal preference of any officer of the court. Therefore the second and third as well as the first writ were quashed. That case was wholly different from this. It cannot be contended with any degree of force, as it appears to us, that because the sheriff in this case was directed to and did summon the entire panel of forty, the accused was deprived of the privilege of exercising his option of striking as many as four from the panel, or any error committed of which he could complain.

We concur in the opinion of the learned judge below that the provisions of the statute, requiring that the number of persons drawn from the box should not be more than four in excess of the number summoned, was clearly not intended as a protection to the party to be tried, but to give the sheriff a certain discretion to be used for his benefit and convenience, to the end that he might be excused if he did not summon all of the jurors drawn, provided the number not summoned was not greater than four. In the very nature of things, the mere irregularity complained of in this case did not and could not have prejudiced the accused, and, therefore, the refusal of the trial court to quash the writ of *venire facias* is without error.

The second assignment of error presents the question whether or not the court erred in permitting, over the protest and objection of the accused, the testimony of the witness, J. H. Joyner, to go to the jury.

The only ground upon which the objection to the testimony of this witness could rest at all is that a part of it relates to matters not communicated to the accused.

By way of introduction this witness did make immaterial statements, but it does not appear to us that any part of his testimony was, in a legal sense, prejudicial to the accused. The accused had made vicious and violent threats, showing unmistak-

ably a deadly hostility on his part toward the deceased, some of which threats were more or less impersonal, and some of them conditional, but all tending to show "malice," either general or special, toward the deceased; all of these threats tending to show, also, the intent of his mind towards the deceased, or towards anyone who would dare to prosecute him for a criminal violation of the liquor laws, after having claimed to be his friend, so as to cause him to lose a large sum of money, and the testimony of Joyner was entirely proper and material to prove that the purpose of the deceased to prosecute the accused was communicated to the accused before the murder of the deceased. Joyner testified that on the very day this murder was committed he (Joyner) had told the accused that "Mr. Jones was going to prosecute him for selling liquor without a license"; that "he had as well get ready to pay the fine," and that he (Hardy) "had just as well get ready to pay a fine for selling liquor without a license, because Mr. Jones had him faded." Whether all the facts testified to by Joyner were communicated to the accused or not, they were, in our opinion, facts which were proper to introduce into the case for the purpose of showing the state of feeling existing between the deceased and the accused, and of showing the apprehension of the accused that it was the settled purpose of the deceased to have him prosecuted and punished for both the illicit sale of liquor and perjury.

The third assignment of error is the admission of testimony of the witnesses Jesse Copeland, Claude Norfleet, and Joseph I. Johnson, who testified to certain threats made by the accused, of an alleged vague, indefinite or conditional character.

The statement of Johnson is: "I heard him (accused) say the day he went home from here on the will case that he would have killed him on that day if he had opened his lips to him." "He did not say much about the will. He cursed and quarreled over it some and said he was going to kill Grac. Jones, damn him." Copeland testified that the accused had said in his presence "that if a man was to report him in this low, underhand

means of pretending to be friendly with him, and come in and buy whiskey and then go out and report him and get him into court and trouble, he would kill him for it"; that "he did not mean any man that might report him, or any man that would be a witness, but a party that would underminingly, as he called it, buy whiskey from him."  —

It is true that the threat testified to by Copeland was a general threat, and in a sense a conditional threat, and was made some time before this murder, but it tended to show a purpose in the mind of the accused to kill any man who should subject him to prosecution and fine for the illicit sale of liquor.

As we have seen, the deceased, at the time of his death and prior, was engaged in puting in motion against the accused the machinery of the law to punish him for selling liquor without a license, and the accused had been informed a few hours before deceased met his death that he (deceased) had the evidence on him (the accused) and was going to prosecute him.

The authorities, so far as we have been able to examine them, unmistakably hold that conditional threats are admissible, wherever it is shown that the party who has been attacked had put himself within the conditions laid down by the party making the threats.

The rule as to admissibility of such evidence is well stated in 21 Cyc. p. 922, under the head of *"Indefinite, Impersonal and Conditional Threats,* as follows: "A threat to kill or injure someone not definitely designated is admissible in evidence where other facts adduced give individuation to it; but general threats not shown to have any reference to the deceased cannot be proved. So also words uttered under such circumstances as *prima facia* to import a threat are admissible. The fact that the threat made was conditional, or was immediately retracted, does not affect its admissibility."

"Nor is it necessary to name the threatened party when the facts and circumstances make it clear that the deceased was the party intended." *Mathis* v. *State,* 34 Tex. Crim. R. 39, 28 S.

W. 817; *Hardy* v. *State,* 31 Tex. Crim. R. 289, 20 S. W. 561; *Cribbs* v. *State,* 86 Ala. 613, 6 South. 109.

Norfleet's testimony excepted to was that a year or two before the trial the accused, in witness' hearing, remarked that if anyone was to indict him and cause him to pay out a whole parcel of money, he would kill him. With respect to this witness it is only necessary to observe here that witnesses not unfrequently overestimate the lapse of time, and the jury might well have considered from all the evidence in the case that this remark of the accused in the presence of Norfleet was not anything like two years, or even a year, before the murder of the deceased. The testimony of this witness was entirely competent to show the ill-feeling existing between the deceased and the accused for some time, perhaps a year, prior to the murder of the deceased.

Joseph I. Johnson testified that about a week before the killing of the deceased he heard the accused say: "All right." "If things turned out like they looked, he was going to kill him, damn him." Now both Joyner and Johnson clearly appear to be reluctant witnesses against the accused, and though Johnson said that he did not know whom the accused was talking about, "whether a man, or a snake, or a mule, or who," it was within the province of the jury to determine the facts and to draw reasonable inferences therefrom; and it is perfectly evident that the jury understood from the language of the accused, testified to by Johnson, that he referred to some man, and were warranted from all the evidence adduced in the conclusion that he referred to his avowed enemy, the deceased.

R. W. Withers, on behalf of the Commonwealth, testified that on the afternoon of the murder of the deceased, which occurred as stated between ten and eleven o'clock P. M., deceased came to Suffolk and inquired of witness why he did not proceed to prosecute the accused (Hardy) for selling liquor without a license and for perjury, claimed by the deceased to have been committed by the accused in his testimony with reference

to the will of Z T. Holland, which testimony of the accused
had been taken before a notary some five or six days prior to
this conversation between the witness, Withers, and the de-
ceased.  Withers testified to no threat made by the deceased,
but only to the effect that the deceased entertained feelings of
revenge and ill-will towards the accused.  The witness also tes-
tified in respect to facts and circumstances immediately pre-
ceding the murder, tending to show the animus of the deceased
towards the accused, and it may be that if there had been no
other evidence in connection with the statements of the witness,
bringing home to the accused knowledge of the deceased's feel-
ings towards him, there would be force in the position that this
evidence of Withers was inadmissible; but it is to be borne in
mind that the accused was told by Joyner on the very day of
the murder that the deceased was going to prosecute him for sell-
ing liquor, and was also told between October 20 and 26, the
day of the murder, that Jones was going to prosecute him for
perjury.  Moreover, a material part of Withers' testimony,
where he testifies as to what the deceased said and did on the
20th of October, six days before the murder, as to the purpose
of the deceased to prosecute the accused for selling liquor and
for perjury, is corroborated by the accused's own witness, B. R.
Doughtie, who stated that he saw and conversed with the accused
on his return from Suffolk the evening of the 20th, and that
the accused said, among other things, that at the taking of his
testimony touching the Holland will, Mr. Grac. Jones (de-
ceased) was sitting near by, and every time he (accused) would
say anything he could hear him (Grac. Jones) say in a low
tone, "That is a lie."

The testimony of Withers, to a considerable extent, is not
very material, but was not incompetent, while the other facts
he testified to were admissible, as the lower court properly
held, as tending to show the state of feeling existing between
the accused and the deceased just prior to the killing of the
latter.  Moreover, the objection made to Withers' testimony

is in general terms, without pointing out the objectionable parts; and it is well settled by numerous decisions of this court that where exception to the testimony is general and where a portion of the testimony is proper and a portion improper, the court should overrule the exception. See *Trogden's Case,* 16 Gratt. 64; *Sulphur Mines Co.* v. *Thompson,* 93 Va. 293, 25 S. E. 232; *N. & W. Ry. Co.* v. *Sutherland,* 105 Va. 545, 54 S. E. 465, and authorities cited in those cases.

It is very true that some of the threats of the accused which were testified to by Joyner and others were impersonal or conditional, but clearly, as the authorities show, they were competent for the purpose of showing general malice on the part of the accused, particularly when taken in connection with the other definite, express, personal and malignant threats made by the accused with direct reference to the deceased, established beyond question by the testimony of the same or other witnesses in the case.

"Greater latitude is allowed in the presentation of evidence where it is purely circumstantial than would be admissible where it is sought to establish the contention upon direct and positive testimony. In the reception of circumstantial evidence great latitude must be allowed. The jury should have before them every fact which will enable them to elucidate the transaction and to come to a satisfactory conclusion. However remote or insignificant a fact may be, if it tends to establish a probability or improbability of a fact in issue, to make it more or less probable, it is admissible." 3 Cyc. p. 110.

Direct evidence can rarely, if ever, be produced in a case like this, where the assassination is in secret, in the darkness of the night, and where no human eye, not even the unfortunate victim, could see the hidden foe, and of necessity, from the very nature of the case, the crime can only be proved by circumstantial evidence. If this were not a correct and an established rule of evidence, many of the most atrocious crimes known to society would go unpunished, and society be illy protected, es-

pecially against such shocking and dastardly murders as we are now dealing with.

The facts proven in this case are: That bitter feelings existed between the accused and the deceased; that deceased, just prior to his death, had been talking freely about the accused on the streets of Holland and elsewhere. He did not pick his men to talk to about accused, but talked "open and above board," and that too, in a small town where the accused was a prominent business man. The accused had just testified in the will case, at which time the deceased was sitting behind opposing counsel prompting him as to the line of attack, and was heard by the accused frequently to say in an undertone, "That's a lie," when the accused was testifying. That the accused had on numerous occasions stated that any person who had once been his friend and afterwards turned against him, informing on him for selling liquors without a license he would kill; that he knew that the deceased was informing on him both as to the selling of liquor and as to the still graver charge of perjury; that the accused had said to several people just prior to the killing of the deceased that he "was going to kill Grac. Jones, damn him"; that "If Jones came in his store he would kill him"; that he would "give $50.00 to have Jones alone in the Dismal Swamp, and work nights to make the money"; that "Jones had spoken to him at church where he had the advantage of him, but his (accused's) time was coming."

With these facts proven by uncontradicted evidence it is clear to us that the statements of Copeland, Norfleet, Johnson and Withers were properly allowed to go to the jury, to be considered, as they were told, along with all the threats proven in the case, and to be given such weight in connection therewith as the jury felt it deserved. Supporting the ruling of the trial court admitting the testimony of these witnesses are numerous cases cited in the opinion of the learned judge below, which is before us, from the States of Alabama, Georgia, Indiana, Missouri, Montana, Nevada, Ohio, Pennsylvania and Texas, and

also cases decided by this court, viz.: *Snodgrass' Case,* 89 Va. 679, 17 S. E. 238; *Muscoe's Case,* 87 Va. 460, 12 S. E. 790. See also 21 A. & E. Enc. L. 220, and authorities there cited.

The learned counsel for the accused in this case seem to contend for the view that evidence as to the state of feeling existing between the accused and the victim of a murder can only be admitted after it is shown that the accused committed the crime; but the authorities by no means sustain this view.

A case in point is *Keener* v. *State,* 18 Ga. 228, 63 Am. Dec. 269, where the court said: "The true distinction, we apprehend, as to the admissibility of evidence of threats, and one apparently overlooked in many of the cases, is this: When sought to be introduced by the defendant as a justification for the homicide, and without any overt act, he must show that they have been communicated; otherwise, they can furnish no excuse for his conduct; but when offered to prove a substantial fact, viz.: the state of feeling entertained by deceased toward the accused, it is competent testimony, whether a knowledge of the threats be brought home to the defendant or not. When the fact of homicide is admitted or established by the evidence, circumstances showing the temper and conduct of the parties and illustrating their feelings towards each other previous to the fatal meeting are admissible in evidence as tending to throw light on the question of malice and intent." 21 Cyc. 892. *Dean's Case,* 32 Gratt. 912.

The same principle is recognized by this court in *O'Boyles' Case,* 100 Va. 785, 40 S. E. 121, where the opinion by Keith, P., says: "The evidence objected to was not admitted as tending to prove the perpetration of the crime wit hwhich the prisoner was charged, but for the purpose of showing the relation between the parties, their state of feelings and course of conduct towards each other, and as reflecting light upon the motive and intent with which the act was done."

To review here the numerous authorities cited by the learned counsel for the accused would needlessly prolong this opinion,

since our examination of them leads either to the conclusion that they do not sustain the view contended for, or are in conflict with the great weight of authority, and, therefore, could not be given our approval.

Exception is taken to the testimony of the witness C. E. Everett, who was a detective of Norfolk, Va., and testified that a short while before this murder he was employed by the deceased (Jones) to go to the town of Holland for the purpose of getting up evidence with the view of prosecuting the accused (Hardy) for selling liquor illegally. The ground of objection to this evidence is that the visits of Everett and his efforts to get up evidence wanted by the deceased were not known to the accused, and, therefore, could not have prompted a motive in him to commit the crime with which he stood charged.

In answer to this exception we deem it only necessary to say that it would be difficult to perceive how the evidence of Everett could have done more than produce upon the minds of the jury the impression that the deceased entertained intensely bitter and revengeful feeling towards the accused. There is nothing whatever in the evidence given by the witness which indicated, or even suggested to the jury that the accused was guilty of the charge for which he was then being tried. On the contrary, if the evidence of the witness made any impression on the jury, it must have been favorable to the accused, for the reason that the witness stated that he found in his investigation no evidence of guilt against the accused, and the jury were told that this evidence was admitted for the sole purpose of showing the feelings between the deceased and the accused. The authorities we have cited abundantly sustain the ruling of the trial court in admitting the evidence of this witness.

Another assignment of error is the admission of the testimony of witness P. S. Livermore, treasurer of the Ithaca Gun Co., to prove an original entry upon the regularly kept books of that company. The witness proved that the sales book of the Ithaca Gun Co. produced at the trial, showing the records of ship-

ments made by that company from the 30th day of October, 1906, to the 18th day of September, 1907, was a book containing original entries. In other words, it was proved that the sales book was in fact one of the books regularly kept by the Ithaca Gun Co., and used for the purpose of making just such entries and records as appeared therein. Very true the bookkeeper who made the entry proved in this case did not testify on the trial, but it is also true that the bookkeeper's attendance could not be enforced, as he was beyond the jurisdiction of the trial court. The book produced in this instance was certainly a book of equal authenticity with an ordinary book of accounts, and this court held as far back as the cases of *Downer* v. *Morrison,* 2 Gratt. 250, and *Hampton, &c.* v. *Michael,* 6 Gratt. 151, that "copies of original entries on plaintiff's books were competent evidence to show to whom goods were sold." Here not a copy of the entry but the original book of entry was produced and authenticated by an officer of the company.

The case of *Vinal* v. *Gilman,* 21 W. Va. 301, 45 Am. Rep. 562, is directly in point, in which it was held, that "A book of original entries, in which an entry is made in the usual course of business, at the time of the transaction, of matters within the personal knowledge of the bookkeeper, is admissible if the bookkeeper be dead at the time of trial, or be a non-resident, or cannot be produced as a witness on account of insanity or other cause."

We are of opinion that the testimony given by Livermore, to the effect that the Ithaca Gun Co. sold and shipped to the Leonard Hardware Co., on June 29, 1907, a certain lot of guns, among which was a gun having upon its fore-arm the same number on the fore-arm of an Ithaca gun picked up near where the victim of this murder was found lying, was properly admitted in evidence as tending to prove a fact to be considered by the jury along with the other facts and circumstances which the evidence adduced tended to prove, viz., that one of these guns was afterwards owned by the accused and was in his possession shortly before this murder.

In the course of the trial J. U. Burges was permitted to testify as to inconsistent statements of one Everett Holland, a witness called for the Commonwealth, and to discredit the testimony of that witness. This ruling of the trial court is assigned as error.

It clearly appears in the record that the course of proceedure adopted by the attorney for the Commonwealth in respect to the summoning, examination and impeachment of the witness, Everett Holland, conformed to the requirements of section 3351 of the Code of 1904, and has the approval of this court in *McCue's Case,* 103 Va. 870, 49 S. E. 623. Here both of the conditions upon which the contradiction and impeachment of a witness by the party who called him is permissible, were shown to exist. The witness, Holland, turned out to be adverse to the Commonwealth, and the attorney for the Commonwealth was "surprised" by the evidence he gave in, as was stated by Mr. Burges. In this connection the court properly instructed the jury that the evidence of Everett Holland, so far as it contradicted any statement of any witness introduced by the defense, was proper rebuttal, and so far as it showed he had made different statements to Mr. Burges, "it can only go to his (Holland's) credibility, and affect his veracity and truthfulness." This, the accused's seventh assignment of error, is also without merit.

The eighth assignment of error relates to the refusal of the court to set aside the verdict of the jury, because the jury had been permitted by the officers of the court, during the trial, to attend a moving picture show.

It appears that the jury, in company with two deputy sheriffs, on two nights during the trial, were allowed to go in a body and occupy one of the galleries of a room in which the moving pictures were exhibited; that this gallery was used exclusively by the jury and the deputies, and that no person communicated with them while in attendance upon the show; nor is it contended that any wrong was purposely committed

by anyone connected with the visit to this entertainment, but it seems to be conceded that all were acting in the best of faith.

It is contended, however, by counsel for the accused, that as the pictures exhibited at the show were a reproduction of a tragedy called "Vengeance in Normandy," wherein two suitors for the hand of a lady quarreled and one of them lay in wait along a road near the home of the lady, attacked his rival with a dagger and felled him to the ground, the attack, however, not proving fatal, this exhibition was calculated to influence and inflame the minds of the jury by reason of its similarity to the case which they were trying, and that the scenes on the canvas were calculated to unduly impress them with the horror of the crime, and to prejudice their minds, unconsciously it might be, against the accused.

We fail to appreciate the similarity of the exhibition witnessed by the jury to the case they were trying, but do recognize the indiscretion on the part of the officers of the court in charge of the jury, and their conduct is highly censurable. The question, however, to be determined here is: Has the accused been prejudiced by the misconduct of the officers in permitting, and of the jury in attending, the picture show, of which he only complained after the jury had rendered their verdict, although he knew before the conclusion of the trial that the jury had been attending the show? As already stated, there was no communication made to the jury bearing directly or indirectly upon the issue of the guilt or innocence of the accused, and we have searched in vain the record for a fact or circumstance in this connection prejudicial to the accused. The fact that the jury saw a picture of a somewhat tragic character falls far short of reasonable ground of objection to their verdict. Nowhere in the record does it appear that any member of the jury was influenced or affected in any way, or could by possibility have been influenced or affected by seeing the picture show. On the contrary, the positive and uncontradicted proof, taken after the trial had ended, demonstrates not only that

no member of the jury was directly or indirectly prejudiced against the accused by seeing the picture referred to, but that not the slightest impression affecting the case which they were to try was made, or could have been made, by anything that appeared upon the picture.

The foregoing facts as to the jury not having been communicated with or affected in any way prejudicial to the accused by their attendance upon the picture show are borne out by the affidavits of the deputy sheriffs who had charge of the jury, and by each member of the jury themselves, read to and considered by the court on the motion to set aside the verdict because the jury had attended the picture show. No case can be found, we believe, where it is held that a verdict of a jury should be set aside upon the facts shown in this case touching the attendance of the jury on the picture exhibition. Of course, as the authorities hold, where the jury or some member of it was in some way subjected to influence which would be calculated to influence them in coming to a verdict, the verdict should be set aside; but the mere sight or hearing of things which were harmless and innocent, and which had no connection with the case they were trying, and could have no bearing or influence upon their verdict, will not serve to invalidate their verdict.

This view in sanctioned by *Thompson's Case,* 8 Gratt. 637; *Trim's Case,* 18 Gratt. 983, 98 Am. Dec. 765; *Kennedy's Case,* 2 Va. Cases 510; and it also has sanction in *McCue's Case, supra,* where it was held that the reading of the daily newspapers in which full accounts were given of the trial, with sensational headlines, which could hardly escape the attention of the reader, even though he faithfully endeavored to avoid all parts of the newspaper which referred to the trial, was not sufficient ground to invalidate the verdict of such jury, especially when the counsel for the accused knew at the time that the jury were so reading such newspapers, and made no objection until after their verdict was rendered. See also Thompson & Merriam on Juries, pp. 413, 415.

In this case it is conclusively shown by the evidence taken after the trial that counsel for the accused knew that the jury attended the moving picture show before the case had been submitted to them for their verdict, and that with knowledge of this fact they remained quiet and raised no objection to the action of the jury in this behalf, taking their chances of a favorable verdict, and raised this question only after the jury had rendered a verdict against the accused.

"A party cannot go forward with a trial and take his chances of success and, after the case has gone against him, seek a new trial upon some act of the jury known to him before the case was submitted to them, and which he afterwards claimed to be misconduct." *A. & D. Ry. Co.* v. *Peake,* 87 Va. 130, 12 S. E. 348; *Williams' Case,* 93 Va. 769, 25 S. E. 659; *McCue's Case, supra.* See also *State* v. *Ballew,* 83 S. C. 82, 63 S. E. 688.

We are now brought to the remaining assignment of error, which presents the question whether or not the trial court should have set aside the verdict because contrary to the law and the evidence.

The law of the case was propounded to the jury in a series of instructions, to none of which did the accused take exception, and many of the material facts and circumstances proven at the trial have been already adverted to in connection with other questions disposed of in this opinion and need not be here repeated.

At the outset we may say that the evidence very conclusively shows (1) that the accused had not only a grudge against the deceased, but bore toward him a feeling of revenge; and (2) that he held human life cheap, and was a man whose first thought was to kill the man against whom he felt a grievance. The threats he made against the accused, which we have narrated; the finding on the scene of this horrible tragedy of the fore-arm of an Ithaca gun such as was owned by him in his possession up to the date of this murder, so far as the evidence shows; the putting into his pocket of a pistol answering in

character and calibre to the character and calibre of the pistol from which the bullets entering the body of his victim might have been fired; and the wad found in deceased's body of the size used in the gun he owned, and the stamp as to contents answering to the class of cartridges he alone kept on sale in the neighborhood, told an awful and damning story against the accused, and, along with other facts and circumstances testified to, entwined around him such a network of incriminating circumstances that he did not, and could not, extricate himself.

He attempted to prove by A. A. Holland and his wife, at whose house he had lived on the most intimate terms and relationship for years, and by a sojourner at that house for some months, an *alibi;* but with respect to this testimony we forbear to say more than that a careful reading of it leads irresistibly to the conclusion that the jury were well warranted in wholly disregarding it, as doubtless they did.

A weak and absolutely futile attempt was made to prove that the accused had parted with the Ithaca gun traced to his ownership, several days before the 26th day of October, 1908, and the one witness testifying in this connection not only could not give the name of the buyer, but told such a flimsy and improbable story that the jury could not have given the least credence to it. To the finding of the fore-arm of an Ithaca gun bearing the number 140,444, dropped by accident by the assassin at the scene of this crime, is added the proof of the incriminating circumstance that this same fore-arm of the gun had bounded or dropped off the gun when used by its owner from whom the accused acquired it; that the former owner, while out hunting with this gun but a short while before the accused became its owner, said to his companion that a piece of his gun was gone, and upon the suggestion of this companion search was made where the gun was last fired and there the missing fore-arm was found. By an unbroken chain of circumstances, an Ithaca gun bearing upon its fore-arm the number 140,444, was substantially and fairly traced from the manu-

facturers of the gun at Ithaca, N. Y., to a firm in Petersburg, Va., from that firm, in October, 1907, to Holland & Hardy who bought it for Holland; from Holland to Samuel Hardy, the accused, and from the accused to the spot where the deceased, the object of the accused's venom and malice, received his death wounds, and from just such a gun, loaded with just such cartridges as that gun carried, and just such as the accused had a supply of.

Again, the accused sought to break the force of the circumstantial evidence unmistakably pointing to him as the person guilty of the foul murder of the deceased, by introducing testimony to show that a negro man by the name of George Wiggins had made some sort of a vague and indefinite threat against the accused or his family; but in addition to this testimony developing nothing worthy of the consideration of the jury, Wiggins testified for the Commonwealth at the trial of this case, and made the statement, which remained uncontradicted, that he and the deceased were never unfriendly; that they amicably settled the little differences between them about some ditching some time before the deceased's death, and that he (witness) was not in the county of Nansemond, but in the county of Isle of Wight, on October 26, 1908, the date of the murder of the deceased.

The accused was clearly put in a position in which it was incumbent upon him to explain the incriminating circumstances pointing to him as the party guilty of the horrible crime with which he was charged. If he had made a *bona fide* disposition of the gun in question, he could have proven it beyond all doubt, and his effort to prove that fact and an *alibi* by unsatisfactory evidence left him in a worse condition than if he had not made the effort.

It is well recognized that the conduct of one accused of a crime, after its commission becomes known, is a circumstance to be considered. On the day after the commission of this murder, when all, or nearly all, persons in and around the little

town of Holland were going to the home of the deceased, offering sympathy to the family, and to aid in running down the perpetrator of the crime, the accused went not to the home of the deceased, nor did he manifest the least concern as to what had happened; but in the course of the day when it had become generally known that bloodhounds had been ordered and were expected soon to arrive, he mounted a lumber wagon and rode away into the forest where he remained for hours, and doubtless till all fear of being pursued by bloodhounds had vanished.

The jury have considered the vicious and repeated threats proven to have been made by the accused, going to show that he was a declared enemy of the murdered man, having a motive to take his life; that he had a double motive—one, of revenge, the other to prevent a prosecution against him for a criminal offense—in fact two, for one of which, if found guilty, he would have been severely punished. All the evidence tending to prove the motive, the proximity, and the opportunity, concentrated on the accused, and his efforts to break down this overwhelming proof adduced by the Commonwealth wholly failed. The entire evidence in the case has had careful consideration, and while there is, naturally, numerous conflicts and inconsistent statements of witnesses therein, the jury were the sole judges of the facts and circumstances which the evidence tended to prove, and the inferences or conclusions to be drawn therefrom, and they have concluded that the evidence established the guilt of the accused.

By a long line of decisions by this court, coming down to *O'Boyle's Case, supra,* and later, it has been settled that the jury are not only the judges of the credibility of witnesses, but of the weight to be given to their testimony, and their verdict solves all conflicts and contradictions among them; that a court has no power to grant a new trial, unless the verdict is against the law, or is contrary to the evidence, or is without evidence to support it.

Upon the whole case, we are of opinion that the verdict

against the accused was not only fairly rendered, but is amply supported by the evidence, and, therefore, the judgment of the circuit court in accordance with the verdict of the jury is affirmed.

*Affirmed.*