## Norfolk

CLAUDE C. DUNCAN, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 0409-85

Decided August 19, 1986

718

COUNSEL

Leon R. Sarfan (Sarfan & Nachman on brief), for appellant.

Eugene Murphy, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

Opinion

**HODGES, J.**—Claude C. Duncan, Jr. was tried by a jury on January 15 and 16, 1985, on charges that he murdered Ronald Mullis and used a firearm in the commission of the murder. The jury found him guilty of both charges. On March 1, 1985, in accordance with the verdict, the court sentenced Duncan to life imprisonment on the murder conviction and two years on the firearm offense. Duncan complains that certain rulings by the trial court denied him a fair trial. He also claims that the court erred by refusing an intoxication instruction even though there was evidence to support giving it. Finding no reversible error, we affirm the judgments.

On February 1, 1984, at approximately 11:05 p.m., Ronald Mullis was found dead in his car in the parking lot at his employment after his shift at work. The cause of death was a gunshot wound to the head. He and Duncan were employees of the Newport News Shipbuilding and Drydock Company ("the shipyard") in the O-43 Department, Maintenance and Utilities. Approximately one week prior to Mullis' death, Duncan visited Kenneth Wilburn, a co-worker, gave Wilburn his keys to lockers and doors for various power plants at the shipyard, and told him that he was quitting his job. Wilburn said Duncan did not return to work after that date. Duncan had complained to Wilburn in December of 1983 that others were getting raises and he wondered why he did not receive a raise. Wilburn testified that an employee would first have to talk to his supervisor about a raise and that the victim, Ronald Mullis, was Duncan's supervisor.

For approximately three to four months prior to the homicide, Duncan lived at the Patton Motel on Jefferson Avenue in Newport News. On February 1, 1984, the night of the shooting, Duncan came to the motel office around 10:30 p.m. and gave Ricky Dickson, the motel clerk, three letters. He told Dickson: "Make sure that you mail those letters for me." Dickson told him he would and he placed all three into the motel mailbox. One letter was addressed to the *Daily Press*, a Newport News newspaper. Another was addressed to Duncan's estranged wife, but Dickson could not recall to whom the third letter was addressed. Dickson asked Duncan where he was going all dressed up, and Duncan told him he had to go downtown and take care of some business. Dickson asked him to bring back a couple of beers or some whis-

key and Duncan said that would be no problem because there was some in his room. Duncan then said: "Well, I got to go and I'll probably see you in about an hour or so." He did not, however, return to the motel until approximately 7:30 a.m. the next morning when he was immediately arrested by waiting Newport News police officers.

The murder occurred in the supervisors' parking lot at the shipyard at approximately 11:05 p.m. Shortly thereafter, Detective Spinner of the homicide squad of the Newport News Police Department received information at the crime scene which led his investigation to the Patton Motel. At the motel he learned of the three letters that Duncan had given to Ricky Dickson to mail. Dickson, however, would not permit the detective to open the letter addressed to the *Daily Press*. The detective contacted David Gibson, an investigative reporter for the newspaper, and when Gibson arrived at the motel Dickson gave the letter to him. Gibson read it, handed it to Detective Spinner and he read it. Detective Spinner then followed Gibson to the *Daily Press* building and received a photocopy of the letter, while Gibson retained the original. At trial, the original letter was proffered and admitted into evidence over the defendant's objection.

The letter, purportedly written by the defendant, dated February 1, 1984, the night of the murder, reads, in pertinent part, as follows:

On last Monday, I went to my union office about a grievance of (sic) which I filed against two fellow workers in O43 Dept . . . while talking to Thompson my union rep I was informed that my grievances were untimely and that I had better watch out because the yard was out to get me, because of my complaint plus a report of pictures taking in oct. in order to report another violation of fellow workers having unauthorized equipment in the yard. A locker inspection was held and my supervisor was present when this inspection was held, but walked by the locker which contained the t.v. and c.b. gear, and stolen cleaning gear, but he never turned Brownley in, but instead refused my request for a raise from July 1983 . . . But one (sic) last Monday, I read a statement by my supervisor who made a statement that my previous service in the Navy made me more (sic) no receptive of the

policy's (sic) that was implemented, otherwise if something was wrong, I was not to make a complaint regardless of the danger, but this was totally due to my expert training in the Navy. All his statement was a lie . . . Also Mullis stated that my problems in my marriage made me feel like I was harassed, but my personel problems had nothing to do with my complaint or grievance . . . I have tolerated all I can take, I taken it to the proper people, but they have time limits but my union never mentioned this to me . . . so don't think whatever happened on Weds nite was racially motivated. No, it was a lack of interest or support, all supervisor in O43 Dept was told of the incident but informed me to not report it and they would handle it.

The deceased's name and the names of two other shipyard supervisors appeared in the left-hand margin at the end of the letter. The Commonwealth's theory of the case was that these names comprised a "hit list" of those at the shipyard with whom Duncan intended to get even. At trial the two supervisors testified, in part, to the location of their parking spaces at work in relation to the deceased's space. Jim Vannoy, shift foreman in the 0-43 Department, testified that he was on the day shift, that he had taken part in an investigation based upon a complaint by Duncan about C.B. gear and stolen cleaning materials, and had at that time accompanied another supervisor to check out the complaint. They found nothing to confirm Duncan's complaint. The Commonwealth's Attorney asked Vannoy where he parked on February 2, what hours he had worked, and whether he had parked that morning in the same area as Mr. Mullis. Duncan objected to the question whether Vannoy had parked anywhere near Mr. Mullis that morning. He argued that the question was leading and the objection was sustained. The question was not asked again.

Frank Roundtree, general foreman in the 0-43 Department, testified that when Duncan's complaint was made he immediately inspected lockers for radios and televisions but found nothing. The night of the murder, he was called at home at 11:30 or 12:00, went to the shipyard, returned home around 3:00 a.m. and then went back to the shipyard around 6:00 a.m. He said that he parked two to two and a half blocks from where Mullis parked.

During the suppression hearing before trial, Dickson testified that Duncan told him "he was having problems with the shipyard and that one of the men down there—was just a brief conversation about the man and he said that he would get even with the motherf\*\*\*er" but Duncan did not mention any names. Defense counsel requested a ruling on the admissibility of the "MF" statement and argued that the prejudicial effect outweighed the probative value since the statement was not linked to the deceased and was ambiguous. The court replied that the statement's admissibility would be dependent upon the background information leading up to the statement.

> THE COURT: Now, just the statement per se, if he just said that without any background whatever, I'm going to get that so and so, it would not be admissible. If it's sufficiently tied in with other information. . .
>
> \* \* \* \* \*
>
> For example, if he had made the statement the day before I don't think it would be admissible, but if it's made within the same time frame, within a reasonable time of which he might carry it out, I think possibly it would be admissible. So that is my thinking on it. I can't rule until I know what the evidence is.

At trial, Dickson testified that he and Duncan had discussed Duncan's employment briefly about three to four days to a week prior to the murder, and Duncan told him he was having trouble at the shipyard and was not working there anymore. Dickson told him: "[I] wouldn't really worry about it, you know and he just said that he was going to get even with some motherf\*\*\*ers down there." Defendant objected, arguing again that the threat was general, directed at no one in particular and "too remote" in time to the murder. The objection was overruled.

At the conclusion of Dickson's testimony on behalf of the Commonwealth, the defendant moved the court to strike Dickson's testimony regarding Duncan's statement about getting even with some "MFs." Counsel noted that the statement was made, at the latest, three days prior to the shooting of Mullis. The court, however, overruled the motion and held that:

[There] are certain circumstances here that are entirely consistent with the Commonwealth's theory of the case and it's a matter which certainly you can argue as to the creditability (sic), but I think it has some probative value and I'll admit it on the (sic) that basis.

Duncan called David Russell to testify on his behalf concerning a grievance that he had filed with his union. Russell was the secretary of the grievance committee, and testified that the grievance was signed by the shipyard personnel supervisor on November 30, 1983, and by the union representative on December 8, 1983. The grievance report indicated that Duncan had last received a pay increase on March 29, 1982. His grievance was that he was being harassed and treated unfairly by his fellow workers in the O-43 Department. He said that he had made management in O-43 Department aware, to no avail, of negligence and behavior unbecoming employees of the company. He requested an apology from the parties involved and asked that the company cease and desist. The company alleged that the grievance was untimely filed and that the company had neither harassed the grievant nor violated the labor agreement.

A letter written by the deceased was made a part of the report, and said in part that:

(Duncan's) grievance is not with this foreman. I feel that since Mr. Duncan has retired from the Navy he may feel superior to us shipyard workers in that maybey (sic) the job is not operated to his specifications.

Mr. Duncan also said he has a very heavy problem with his wife. He may be confusion (sic) his personal problem with his employment.

## I.

 Duncan complains that the "MF" threat was too "remote" in time to have any probative value. The length of time between a threat and a homicide, standing alone, does *not* make evidence of the threat inadmissible. In *Hardy's Case*, 110 Va. 910, 67 S.E. 522 (1910), the court noted that the threat made by the accused

was a general threat, as well as a conditional threat made some time before the murder, but said,

> [I]t tended to show a purpose in the mind of the accused to kill any man who should subject him to prosecution and fine for the illicit sale of liquor.
>
> * * * * *
>
> The authorities, so far as we have been able to examine them, unmistakably hold that conditional threats are admissible, wherever it is shown that the party who has been attacked had put himself within the conditions laid down by the party making the threats.

*Id.* at 919, 67 S.E. at 526.

In *Maxwell v. Commonwealth*, 167 Va. 490, 187 S.E. 506 (1936), the threats made by defendant toward the victim were made a year or more before the killing. The court held that the remarks were not inadmissible due to their having been made a year prior to the killing, but that the passage of time might weaken their probative value in the jury's mind. *Id.* at 497, 187 S.E. at 509.

> The element of fixedness is lacking, and the probative value disappears, if the threats in question were made at such a time anterior that the design cannot possibly be supposed to have continued throughout the interval. But no mere distance of time in itself should make threats irrelevant. A design once formed may continue. The defendant may use the lapse of time as a circumstance explaining away the significance of the threats by indicating the possible abandonment of the design.

1A Wigmore, *Evidence* § 108 (Tiller's rev. *1983); see also Newberry* v. *Commonwealth*, 191 Va. 445, 61 S.E.2d 318 (1950).

Defendant also argues that a general threat by an accused directed to no particular person is not admissible unless the prosecution can connect the threat and the victim. He cites *Smith* v. *Commonwealth*, 220 Va. 696, 261 S.E.2d 550 (1980) for support.

In *Smith*, the defendant was tried for the murder of Patricia McGlothlin, who disappeared August 28, 1977. A witness said she met defendant for the first time on August 28, 1977. When she discovered that defendant wanted to involve her husband in a drug deal, she demanded that her husband return Smith to an ice cream parlor in Norton, Virginia. During the ride to the parlor the defendant was "real nervous and got real upset" and said, "I've got it in for someone." Dye said that the defendant would not respond when asked, "Who?"

The court noted that the statement by the defendant was a mere general threat and referred to no particular person. That court also noted that the Commonwealth had the burden of showing the connection between the threat and the victim. *Id.* at 702, 261 S.E.2d at 554. It held that the statement was admissible, however, and followed the holding in *McMurray* v. *Commonwealth*, 143 Va. 489, 129 S.E. 252 (1925), where the court had said:

[B]ut the connection "may sufficiently appear from the circumstances, or subsequent declarations of the accused, and if the circumstances are such that the language used might reasonably be construed to include or refer to the deceased or injured person, the evidence should be admitted and the question left to the jury."

*Id.* at 497, 129 S.E. at 255.

In addition, a threat made against a class of persons is admissible even though the victim is not specifically identified so long as the victim is shown to have been a member of the class against whom the threat is made. C. Torcia, Wharton's Criminal Evidence, *Relevance and Materiality* § 203 (1972).

The class may be so broad as to constitute no specified class at all. Thus, it may be shown that the defendant threatened to kill somebody before night; that he said he was going to kill a man before sundown; that he would "split the skull of any fellow that was saucy;" that he would kill anyone who got in his way; or that he would "get even" with somebody.

*Id.*

Prior to Dickson's testimony, the jury heard evidence that Duncan was upset about not getting a raise when others were; that the first person an employee would talk to about a raise would be his supervisor; that Duncan's supervisor was Mullis; that on the night of the shooting Duncan's co-worker, Kenneth Wilburn, saw him in the shipyard parking lot headed towards the supervisors' parking lot just prior to the shooting; that Wilburn knew Duncan did not work there anymore; and that Wilburn decided not to talk to defendant when the defendant looked at him. Wilburn described his reaction at seeing Duncan in the parking lot: "I ain't (sic) never seen a look that way at me before so my instinct told me to get in my car and get out of the lot."

We believe that the Commonwealth successfully established a link between the threat made by Duncan and the subsequent murder of Mullis and there was no error in admitting the statement.

## II.

Duncan claims that the introduction of the letter to the *Daily Press* was reversible error because: (1) there was no proof that he had written the letter; (2) there was a one-year break in the chain of custody of the letter; and (3) the letter's contents were ambiguous and the Commonwealth failed to sufficiently show a connection between defendant and victim.

On the night of the killing, Duncan gave Ricky Dickson, the motel manager, three letters and asked him to mail them for him. Dickson said that he never read the letter to the newspaper himself, but testified that a photocopy of an envelope shown to him appeared to be identical to the original envelope. He was asked what he based that opinion on and he responded: "Well, it does look the exact same writing as that night and I can remember that far back. That is the letter that Mr. Duncan did present to me, put (sic) in the box, and I did present that to the *Daily Press.*"

One of the four non-statutory ways to authenticate a document is through the use of circumstantial evidence. "The court must determine if the circumstantial evidence is sufficient to justify the document's admission; the jury will then, as in all cases,

make an independent decision as to whether the document is genuine." C. Friend, *The Law of Evidence in Virginia* § 180 (2d ed. 1983). While merely showing that a writing purports to be from a sender is not sufficient, *Harlow* v. *Commonwealth*, 204 Va. 385, 389, 131 S.E.2d 293, 296 (1963), the evidence in this case clearly indicated that Duncan wrote the letter. Not only did he deliver the letter to Ricky Dickson, who identified the handwriting on the envelope as Duncan's, but the contents of the letter were fairly unique to Duncan.

> When the authenticating evidence is circumstantial, however, the question whether reasonable men could find its authorship as claimed by the proponent, may be a delicate and balanced one, as to which the judge must be accorded some latitude of judgment. Accordingly, it is often said to be a matter of discretion . . . if a prima facie showing is made, the writing or statement comes in, and the ultimate question of authenticity is left to the jury.

E. Cleary, *McCormick on Evidence* § 227 (3rd ed. 1984).

The letter in contention here contained information which strongly indicated that Duncan was its author. A large part of the letter's content dealt with Duncan's grievance to his union and delineated specific incidents which, while perhaps known by others at the shipyard, were reasonable indications that he was the author. Part of the letter related directly to Duncan's possible motive for killing Ronald Mullis, who had been his supervisor at the shipyard.

> [O]ne (sic) last Monday I read a statement by my supervisor who made a statement that my previous service in the Navy made me more (sic) no receptive of the policy's (sic) that was implemented, otherwise if something was wrong, I was not to make a complaint regardless of the danger, but this was totally due to my expert training in the Navy. All his statement was a lie to clear himself for not acting on Mr. Griffin and Brownley's constant harassment of me.

> \* \* \* \* \*

> Also Mullis stated that my problems in my marriage made me feel like I was harassed, but my personel problems had

nothing to do with my complaint or grievance.

* * * * *

So don't think whatever happened on Wednesday night was racially motivated. No, it was a lack of interest or support, all supervisor in O43 Dept was told of the incident but informed me to not report it and they would handle it.

We hold that the Commonwealth made a prima facie showing that Duncan was the author of the letter, and its introduction into evidence was not error.

## III.

Duncan's next claim is that the letter was inadmissible due to an eleven month "break" in the chain of custody. This argument is without merit. He contends that the Commonwealth offered no proof of the whereabouts of the letter from the day of the crime until the day of trial. Duncan argues that Detective Spinner's identification of the letter was insufficient to establish a reasonable certainty that there had been no alteration or substitution of the letter. The Commonwealth counters that the chain of custody is only important if there is a likelihood that the evidence might have been tampered with, and that in the present case there was no such evidence.

The appellant cites *Robinson* v. *Commonwealth*, 212 Va. 136, 183 S.E.2d 179 (1971), for the rule that the proponent of demonstrative evidence has the burden of showing a reasonable certainty that the evidence was not altered or substituted. Duncan contends that the court in this case could not assume that the letter was properly handled from the time the letter was taken to the *Daily Press* to the time Detective Spinner picked the letter up from the *Daily Press* office.[1]

To accept Duncan's contention would be to ignore completely the testimony of Detective Spinner, who testified that he followed

---

[1] The contention that the letter was *in fact* tampered with is without merit. The fact that there was a "red check mark" in the margin in no way altered the text of the letter and, in addition, Duncan made no objection in this regard at trial and it cannot be raised for the first time on appeal. Rule 5A:18.

the investigative reporter to the *Daily Press* building, obtained a copy of the letter which he kept, returned shortly before trial to the *Daily Press* and retrieved the original, and compared his copy with the original. He further testified that his copy and the original obtained from the *Daily Press* were the same. This evidence was clearly sufficient to show with reasonable certainty that the letter was neither altered nor substituted. *See Smith* v. *Commonwealth*, 219 Va. 554, 559, 248 S.E.2d 805, 808 (1978). We reject Duncan's contention that the letter was improperly introduced. We believe the Commonwealth carried its burden of showing with reasonable certainty that the letter was authentic and had not been altered or substituted.

## IV.

Duncan further contends that the court erred in allowing testimony from two shipyard supervisors about their parking space locations at work in relation to where the victim parked.

Both supervisors who testified about their parking locations were mentioned in the letter that Duncan wrote to the *Daily Press*. Their names appeared in the margin with Ronald Mullis' name. The text to the right of the margin where their names appeared reads:

> [S]o don't think whatever happened on Wednesday night was racially motivated. No, it was a lack of interest or support, all supervisors in O43 Dept was told of the incident but informed me to not report it and they would handle it.

Duncan contends that the parking location testimony and the fact that the supervisors' names appeared in the letter together with the victims' name, was improperly and repeatedly used by the Commonwealth in closing argument to indicate that Duncan had compiled a "hit list." When he objected at trial to any reference to a hit list, the court held that the Commonwealth could draw any reasonable inference from the facts that had been introduced. Duncan claims that the parking spaces testimony was neither relevant nor material and misled and prejudiced the jury against him.

We hold that the jury could have drawn a reasonable inference that Duncan had included the names of Vannoy and Roundtree in the letter to the newspaper the night of the killing because he intended to take revenge against all those he believed had wronged him. Both Roundtree and Vannoy were supervisors who had taken part in the locker inspections spurred by Duncan's complaint. There was evidence that at the time of the shooting in the parking lot, three shots were fired, but when the police seized the murder weapon from the glove compartment of Duncan's car, the weapon was fully loaded. The police also seized an almost full box of shells. In addition, Duncan's whereabouts were unknown for approximately eight hours between the time of the shooting and his arrest at approximately 7:30 a.m. the next morning. Vannoy and Roundtree did not have to report to work until 7:00 a.m., although they usually arrived earlier.

■ A Commonwealth's Attorney has the right to argue the evidence and all reasonable inferences from the evidence, *Bailey* v. *Commonwealth*, 193 Va. 814, 830, 71 S.E.2d 368, 376 (1952), and we cannot say that the court erred by holding that the argument was properly based on inferences reasonably drawn from the evidence.

## V.

Duncan's final contention is that the trial court erred in refusing to grant an instruction regarding his intoxication prior to the shooting. He argues that it is reversible error for a court to refuse an instruction when there is any credible evidence to support it. *McClung* v. *Commonwealth*, 215 Va. 654, 657, 212 S.E.2d 290, 293 (1975).

The *McClung* case involved a homicide charge against the defendant. The jury was instructed on first and second degree murder, as well as self-defense. The trial court refused to grant an instruction on voluntary manslaughter requested by the defendant based upon her contention that the shooting took place after provocation by the victim. The Supreme Court reviewed the conflicting testimony and noted that the general rule is that whether credible evidence of provocation is sufficient to rebut the presumption of malice arising from a homicide is a question of fact, and the refusal to grant the instruction was reversible error since the jury

was the factfinder. 215 Va. at 656, 212 S.E.2d at 292.

■ The law with regard to an intoxication instruction has no relation to the holding in *McClung*. In *Johnson v. Commonwealth*, 135 Va. 524, 115 S.E. 673 (1923), the Supreme Court explained the limited circumstances under which intoxication would be available as a defense:

> When a man has become so greatly intoxicated as not to be able to deliberate and premeditate, he cannot commit murder of the first degree, or that class of murder under our statute denominated a wilful, deliberate and premeditated killing. But so long as he retains the faculty of willing, deliberating and premeditating, though drunk, he is capable of committing murder in the first degree; and if a drunk man is guilty of a wilful, deliberate and premeditated killing, he is guilty of murder in the first degree.

*Id.* at 531, 115 S.E. at 675-76.

■ Therefore, the only issue on which an intoxication instruction would have been relevant was whether Duncan was capable of premeditation and deliberation, essential elements of a first degree murder charge. In Virginia, mere intoxication from drugs or alcohol is not sufficient to negate premeditation. *Fitzgerald v. Commonwealth*, 223 Va. 615, 631, 292 S.E.2d 798, 807 (1982); *Giarratano v. Commonwealth*, 220 Va. 1064, 1073, 266 S.E.2d 94, 99 (1980). To justify an instruction on voluntary drunkenness, the evidence must show more than the mere drinking of alcohol. *Hatcher v. Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978). The question is whether the facts indicate that the defendant was intoxicated to such extent that he did not know what he was doing or did not know right from wrong. *Hite's Case*, 96 Va. 489, 497, 31 S.E. 895, 897 (1898).

Duncan argues that Ricky Dickson's testimony that Duncan was intoxicated prior to the time he left the motel before the shooting was sufficient to justify the requested instruction. We disagree. Dickson testified that he was out of town for a while in January, but that when he returned the last week of that month, Duncan seemed like a totally different person. He said that their conversations before he went out of town had made sense while, upon his return to the motel, Duncan "would just keep rambling

on." In addition, Duncan's room was now messy whereas it was clean before, and Dickson saw whiskey bottles around which he had not seen before. He said that when Duncan handed him the three letters to mail he could tell Duncan had been drinking that evening "by looking at his eyes and the slur of the words in his mouth." Dickson continued: "And I asked him, you know, where he was going to. And he told me that he was going downtown to take care of some business. And I asked him on his way back would he stop and get me something to drink and he said he would see me in about an hour." Dickson added that he knew Duncan was getting into his car and driving but he did not know where he was going.

The facts of drunkenness attested to by Ricky Dickson are similar to those adduced in *Waye* v. *Commonwealth*, 219 Va. 683, 251 S.E.2d 202, *cert. denied*, 442 U.S. 924 (1979). In *Waye*, the defendant and witness, Len Gooden, had both consumed several beers on the evening of the killing for which Waye was on trial. The defendant claimed that Gooden's testimony that defendant was drunk raised a factual issue of his drunkenness and an instruction on intoxication should have been granted. The Supreme Court rejected his contention, pointing out that even Gooden admitted he had no qualms about riding with the defendant and that the defendant had driven "all right." Other testimony, the court said, showed that defendant was drinking but was not intoxicated. *Id.* at 698, 251 S.E.2d at 211.

In *Hatcher* v. *Commonwealth*, 218 Va. 811, 241 S.E.2d 756 (1978), the defendant was drinking whiskey on the day of the murder. The court stated: "[The evidence was] insufficient to show that [defendant] was so intoxicated as to render him incapable of committing a willful, deliberate and premeditated act. . . . Those events at the time the offense was committed and immediately thereafter show that, even though defendant had been drinking, he was aware of his actions and was not too intoxicated to form the intent requisite for murder in the first degree." *Id.* at 814, 241 S.E.2d at 758.

Dickson did not testify that he observed Duncan drink any alcohol that night. Beyond his opinion that Duncan had been drinking, there was no evidence that Duncan was incapable of premeditating or deliberating. When Dickson saw him that night, Duncan delivered three letters to him, requested that he mail them, and

told Dickson he was going downtown to take care of some business. Dickson made no attempt to dissuade Duncan from getting into his car and driving off, and in fact, asked Duncan to bring him back something to drink. We believe that the evidence of drinking was insufficient to require an intoxication instruction; the trial court did not err when it refused to grant such an instruction.

Therefore, in accordance with this decision, we find that the trial court did not err and we therefore affirm.

*Affirmed.*

Baker, J., and Barrow, J., concurred.