COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, Huff and Athey
Argued at Norfolk, Virginia

MARK M. WHITAKER

                                         MEMORANDUM OPINION[*] BY
v.      Record No. 1686-18-1            JUDGE RANDOLPH A. BEALES
                                         DECEMBER 10, 2019

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Harold W. Burgess, Jr., Judge Designate

Don Scott; Jon M. Babineau (Law Office of Don Scott; Jon M.
Babineau, PC, on brief), for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.


Mark M. Whitaker ("appellant") was convicted by a jury of three counts of forgery under

Code § 18.2-172. He appeals the convictions, arguing that the trial court erred in failing to quash

the indictments due to what he alleges were irregularities in the special grand jury proceedings. He

also argues that the evidence is insufficient to support his convictions and that the Commonwealth

argued facts not in evidence in its closing argument that were so prejudicial that they require

reversal of his convictions.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I. BACKGROUND[1]

Grand Jury Proceedings

"In accordance with established principles of appellate review, we state the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court." Riner v. Commonwealth, 268 Va. 296, 303 (2004). So viewed, the record establishes that at all times relevant to this appeal, appellant was a City Councilman for the City of Portsmouth. On January 17, 2017, the Commonwealth's Attorney for the City of Portsmouth filed a motion stating that the Portsmouth Sheriff's Office, the National Credit Bureau, and the U.S. Department of the Treasury had been investigating appellant and the New Bethel Credit Union ("credit union"), an organization for which appellant served as the Chief Executive Officer. The motion requested that the Circuit Court for the City of Portsmouth appoint a special prosecutor to handle any further investigation and prosecution of appellant "due to a conflict of interest and to avoid the appearance of impropriety." The motion was granted, and an attorney from the Office of the Commonwealth's Attorney in Frederick County was appointed as special prosecutor.

The Commonwealth – through the special prosecutor – made a motion requesting that a special investigative grand jury be convened. The motion also sought the appointment of three individuals – Captain Lee Cherry and Investigator Brett Johnson, both of the Sheriff's Office for the City of Portsmouth, and Special Agent Thomas Kim of the U.S. Department of the Treasury – as specialized personnel "to assist the special grand jury in its investigation pursuant to Virginia Code § 19.2-211." The motion was granted, and a special grand jury was impaneled.

---

[1] Part of the record in this case was sealed. In order to appropriately address the assignments of error raised by appellant, this opinion includes some limited portions of the record that were sealed. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

The special grand jury ultimately returned twenty indictments against appellant, including two for identity fraud, eleven for forgery, and seven for uttering a forged check. After the indictments were returned, the judges of the Circuit Court for the City of Portsmouth recused themselves from the case due to appellant's position as a City Councilman.

Appellant moved to quash the indictments, arguing that pursuant to Code § 19.2-211, only the special grand jury itself – not the special prosecutor – could request specialized personnel to help with the special grand jury's investigation. He also argued that, under Code § 19.2-213, the special grand jury was required to make findings of fact or a written report, which it did not do.[2] The motion to quash the indictments was denied, and appellant's case proceeded to trial.

Trial

In addition to his role as a City Councilman, the evidence at trial established that appellant was the assistant pastor of the New Bethel Baptist Church (the "church") and the Chief Executive Officer and a board member of the New Bethel Credit Union, an institution started by the church's leaders that operated out of an office in the church.

At some point prior to 2013, the leaders of the church formed a plan to tear down and rebuild the Bonne Villa Apartments, a dilapidated apartment complex located across the street from the church. They formed New Bethel Development Company, LLC, to complete the project and hired a contractor, CDSI, to perform the demolition services. At some point during the tear-down process, United Disposal, a disposal company, told CDSI that CDSI could not

---

[2] In the trial court, appellant also argued against the appointment of the specialized personnel in part because Johnson and Cherry were from the Portsmouth's Sheriff's Office, and the Sheriff of Portsmouth was "publicly critical of and openly hostile to Whitaker." Appellant argued at trial and at oral argument before this Court on appeal that the charges and allegations against him were politically motivated and stemmed from the animosity between the Sheriff and him.

dump the building debris from the demolition at its disposal site until it was paid $35,000. This demand stalled the project, leading the City of Portsmouth to send a letter on May 20, 2013, to appellant as the registered agent of New Bethel Development Company setting a deadline for the demolition to begin. The City also set a deadline of September 23, 2013, for the completion of the demolition and stated that failure to complete the project by that date would result in the City hiring its own contractor to complete the work – with the expenses for the completion assessed against the property. The letter triggered a push for New Bethel Development Company to quickly come up with $35,000 to pay United Disposal so as to be able to continue with the project.

Phillip Whitaker, appellant's brother, testified that he was a member of the credit union's board of directors and that he served as its loan officer. He testified that in August 2013, in order to make the $35,000 payment, the credit union issued seven unsecured $5,000 loans – each with a term of six months. He testified that because of the low value of the loans, the credit union did not have to "go through all the sophisticated means that [it] may otherwise, with credit reports and so forth, to approve" these loans. Each of the loan applications stated that the purpose in seeking the loan was as follows: "Emergency loan to prevent a tax lien by the City of Portsmouth on investment property at 4358 Greenwood Drive, Portsmouth VA 23701" – the location of the Bonne Villa Apartments. The loans were made to Phillip Whitaker; Kevin Blount, an employee of CDSI; Valor Contracting Corporation ("Valor"), Blount's defunct contracting company; Etta Whitaker Pierce, appellant's sister; James Whitaker, appellant's

father; the church[3]; and appellant. Only the loans made to Blount and Valor Contracting Corporation are at issue in this appeal.[4]

Phillip Whitaker testified that he had personally spoken with Blount a few days before Blount's loan application was prepared and that Blount had agreed to allow the credit union to issue loans to Blount and to Valor. He testified that Blount was not present when the loan documents were prepared. However, he claimed that Blount had given permission for a member of the credit union's loan review committee to sign Blount's name on the loan documents for Blount and Valor. Phillip Whitaker also testified that he did not know which member of the review committee physically picked up a pen and signed Blount's name to the documents. He also stated that he was unaware that Valor was out of business at the time the loan was made.

Phillip Whitaker further testified that, after the loans were made, he delivered three checks to Blount – to then be delivered to United Disposal – to cover the cost of the debris disposal. One check was a $25,000 cashier's check, which the New Bethel Development Company had received from the loan proceeds from the other loans. The other two checks were for $5,000 each, made out to Blount and Valor. The word "loan" was written on the front of each check. Phillip Whitaker testified that all of the loans made were eventually paid back at some point in 2014 with "some of the funds c[oming] from church proceeds and then [some funds] from the individuals."

Blount testified that, at all relevant times, he worked for CDSI. He stated that he met appellant in meetings regarding the Bonne Villa project. He testified that he did not speak with anyone else from the church about the project, and he stated that he did not even know Phillip

---

[3] The application for the loan on behalf of the church was signed in the name of Vanita Spruill, who was deceased at the time of appellant's trial.

[4] Appellant was acquitted of the other charges when the trial court granted appellant's motion to strike.

Whitaker. During Blount's testimony, the Commonwealth showed Blount a signature card for the credit union containing his information and his alleged signature. Blount testified that he did not fill out the card and stated that the signature on the card did not belong to him. He testified that he did not take out or agree to take out a loan from the credit union in his name or in the name of Valor. He reviewed the loan documents made in his name and testified that the signature on the documents did not belong to him. He testified that he did not give anyone permission to sign these documents on his behalf.

Blount testified that appellant asked him, "[W]ould I take the check in my name to help out with the situation and I told him yes." Blount testified that he accepted and endorsed a check in his name and in the name of Valor. He reiterated that although he agreed to endorse the checks, he did not agree to borrow the money or take out a loan. Blount testified that, after endorsing the checks, he went to the bank with appellant where he cashed both checks and gave appellant the proceeds, which appellant then used to obtain a check for $35,000. A copy of the check for $35,000 made payable to United Disposal was admitted into evidence.

Blount also testified that he had signed an affidavit prepared by Whitaker's counsel or his staff. The affidavit, which was admitted into evidence, states that Blount did not recall whether he gave appellant his permission to use his information to become a member of the credit union or if he gave appellant his permission to sign his name on the loan documents. On cross-examination, Blount was asked if he was under oath when he signed the affidavit, and Blount stated that he was. Appellant's trial counsel then asked, "Is it true?" and Blount responded, "Yes." Blount testified that he signed this affidavit in appellant's counsel's office prior to the trial but after he made two statements to investigators in which he stated that he did not apply for loans from the credit union nor did he give anyone permission to do so on his behalf or on behalf of Valor.

The Commonwealth also introduced evidence regarding the status of the credit union at the time that the loans at issue were made. Gail White-Moore of the National Credit Union Administration (NCUA) testified about her supervision of the credit union and explained that, in 2009, the credit union had entered into a "Letter of Understanding and Agreement" with NCUA. Pursuant to that agreement, the credit union was prohibited from making any loans because of its noncompliance with NCUA requirements. She testified that the moratorium on lending was in place at the time the credit union made the seven loans for $5,000 and remained in place until "the end of the credit union's existence in 2015."

White-Moore also testified that appellant was her point of contact for the credit union and that she requested several documents from him regarding the credit union, including signature cards from the credit union's members. She testified that the credit union was required to have these signature cards on file for all of its members. She stated that after multiple requests appellant eventually provided her with some signature cards, which were entered into evidence. These included signature cards for six individuals, including Blount – each signed and dated on or after October 1, 2014.[5]

After the Commonwealth rested its case, appellant moved to strike all of the charges. The trial judge granted the motion on seventeen of the indictments, leaving only the three charges of forgery relating to Blount and Valor.[6] At the conclusion of the trial, the Commonwealth argued in its closing statement, over appellant's objection, that the jury should compare the appellant's actual signature on appellant's loan documents, credit union signature

---

[5] Appellant also provided NCUA with signature cards for the church's accounts.

[6] Two of the surviving charges were for forging Blount's signature on the loan documents for Blount and Valor, and the third charge was for forging Blount's signature on the signature card for the credit union.

card, and letters of understanding with NCUA, to the supposed signature of Blount on Blount's loan documents and Blount's credit union signature card.

The jury convicted appellant of all three of the remaining counts of forgery under Code § 18.2-172. The trial court then imposed a fine of $2,500 for each conviction.

II. ANALYSIS

The Special Grand Jury Proceedings

In appellant's first assignment of error, he argues that the trial court erred in failing to quash the indictments from the special grand jury for two reasons. First, he argues that the trial court was not permitted to grant the special prosecutor's motion to appoint the three law enforcement officers as specialized personnel because Code § 19.2-211 only allows for the appointment of such personnel when the special grand jury itself makes the request. Code § 19.2-211 states, "At the request of the special grand jury, the court may designate special counsel to assist it in its work, and may also provide it with appropriate specialized personnel for investigative purposes." Appellant argues that the plain language of this statute shows that the court may only appoint these personnel at the special grand jury's request – not at the request of a special prosecutor. The Commonwealth disagrees with appellant's interpretation. It contends that the statute is permissive and allows the trial court to appoint specialized personnel when they are requested by the special grand jury – but that it does not limit the trial court from appointing such personnel in other circumstances, such as on the Commonwealth's motion or on the trial court's own motion.

Even assuming without deciding that Code § 19.2-211 only allows the trial court to provide specialized personnel for investigative purposes at the request of the special grand jury, appellant would not be entitled to the remedy he seeks. While appellant's written brief focuses on the alleged error in the appointment of these individuals, at oral argument before this Court,

- 8 -

he essentially asserted that appellant was prejudiced by the presence of these individuals (two of whom were members of the Sheriff's Office in the City of Portsmouth) because they improperly influenced the special grand jury's decision to find probable cause and return true bills of indictment.[7] However, even if we assume without deciding that appellant is correct that the special grand jury was influenced to return true bills of indictment because of the presence of these individuals, any error created by their presence was cured by appellant's later separate trial – and a completely different jury's return of a guilty verdict at that trial.

A grand jury (or special grand jury) returns a true bill of indictment to show that they have found that there is probable cause to believe that the defendant committed the crime stated in the indictment and that the case should proceed to trial. See Code § 19.2-191; Code § 19.2-206(A)(iii); see also Britt v. Commonwealth, 202 Va. 906, 907 (1961) (stating the grand jury's duty "is to examine into accusations made against persons charged with a crime and determine whether it is proper that they be brought to trial"). The grand jury's finding of probable cause – to determine if the individual should even be brought to trial – is based on a much lower standard than that required for a finding of guilt beyond a reasonable doubt by a petit jury after an actual criminal trial. Therefore,

> [t]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. . . . [A]ny error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

Diehl v. Commonwealth, 9 Va. App. 191, 196 (1989) (quoting United States v. Mechanik, 475 U.S. 66, 70 (1986)); see also Bell v. Commonwealth, 264 Va. 172, 191 (2002) ("[T]he petit

---

[7] On appeal, appellant's counsel did not provide this Court any specific facts as to how the presence of these individuals influenced the decision of the special grand jury, and there is no evidence that these individuals were indeed present during the special grand jury's actual deliberations.

jury's subsequent guilty verdict demonstrate[s] that there was probable cause to charge Bell and that he was in fact guilty as charged beyond a reasonable doubt."). Applying this principle to this case, any error caused by the influence of these individuals on the special grand jury's finding of probable cause was rendered harmless by the petit jury's finding of guilt beyond a reasonable doubt – a much higher standard of proof.

Second, appellant argues that, pursuant to Code § 19.2-213, the special grand jury was required to make a written report of its findings before returning the true bills of indictment. The Commonwealth argues that Code § 19.2-213 illustrates the three different scenarios under which a special grand jury can be convened – by the trial court's own motion, by the recommendation of the regular grand jury, or by the request of the Attorney for the Commonwealth. It contends that under this third scenario, Code § 19.2-213 permits the special grand jury to return true bills of indictment instead of preparing written findings of fact.

Code § 19.2-213 states:

> At the conclusion of its investigation and deliberation, a special grand jury impanelled *by the court on its own motion or on recommendation of a regular grand jury* shall file a report of its findings with the court, including therein any recommendations that it may deem appropriate, after which it shall be discharged. Such report shall be sealed and not open to public inspection, other than by order of the court.

> A majority, but not less than five, of the members of a special grand jury convened *upon request of the attorney for the Commonwealth* must concur in order to return a "true bill" of indictment. A "true bill" may be returned upon the testimony of, or evidence produced by, any witness who was called by the grand jury, upon evidence presented or sent to it.

(Emphasis added.)

"Statutory interpretation is a question of law which we review de novo, and we determine the legislative intent from the words used in the statute, applying the plain meaning of the words unless they are ambiguous or would lead to an absurd result." Wright v. Commonwealth, 278

- 10 -

Va. 754, 759 (2009). The first paragraph of the statute exclusively addresses situations when the special grand jury is impaneled *on the court's own motion or the motion of the regular grand jury*. This first paragraph states that in these two situations, the special grand jury shall file a report. The second paragraph exclusively addresses situations where the special grand jury is convened *at the request of the Attorney for the Commonwealth*, as it was in this case. This second paragraph does *not* contain a report requirement. Because the second paragraph of the statute does *not* contain a requirement that the special grand jury prepare a report in addition to returning a true bill of indictment, we find no error in the trial court's decision not to quash the indictments on this basis.

<u>Sufficiency of the Evidence for the Forgery Convictions</u>

In his second assignment of error, appellant contends that the trial court erred when it failed to grant his motion to strike and motion to set aside the jury's verdict on the forgery charges "when it found: 1) the evidence was sufficient to establish Whitaker signed Blount's name; 2) the evidence was sufficient to establish fraudulent intent under Va. Code § 18.2-172; and 3) that the jury's verdict was not plainly wrong." Specifically, he contends that "[t]he Commonwealth failed completely to prove that Whitaker himself signed Blount's name to the two loan application documents and the bank signature card in question."

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" <u>Crowder v. Commonwealth</u>, 41 Va. App. 658, 663 (2003) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," <u>Riner v. Commonwealth</u>, 268 Va. 296, 330 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" <u>Crowder</u>,

- 11 -

41 Va. App. at 663 (quoting <u>Kelly v. Commonwealth</u>, 41 Va. App. 250, 257 (2003) (*en banc*)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Jackson</u>, 443 U.S. at 319.

Code § 18.2-172 states, in pertinent part, "If any person forge any writing . . . to the prejudice of another's right, or utter, or attempt to employ as true, such forged writing, knowing it to be forged, he shall be guilty of a Class 5 felony." Although no witness testified that appellant was the individual who signed the documents at issue, Phillip Whitaker testified that he witnessed appellant personally sign the loan documents connected with appellant's own $5,000 loan. Those loan documents were admitted into evidence and, in its closing statement, the Commonwealth encouraged the jury to compare the handwritten signatures on those documents with the handwritten signatures on the documents at issue. The jury, after having the opportunity to compare the handwriting of appellant's signature with the handwriting of the signatures at issue, clearly concluded that appellant was the individual who fraudulently signed Blount's name to Blount's credit union signature card and to the loan documents for Blount and for Valor. <u>See</u> <u>Keister v. Phillips</u>, 124 Va. 585, 591 (1919) (holding that the jury may compare genuine signatures with disputed signatures without expert testimony). Therefore, we cannot say that no rational factfinder could have found the evidence sufficient to conclude that appellant forged Blount's signature on the loan documents for Blount and Valor and on Blount's credit union signature card.

Appellant also argues that, even assuming that he signed these documents, the evidence proves that he did so with Blount's permission, thereby negating evidence of his fraudulent intent. He contends that, although Blount testified at trial that he did not give appellant permission to sign the loan documents, this testimony was contrary to Blount's affidavit and to

Blount's later testimony at trial where he agreed that the affidavit was true. He states that Blount's contradictory testimony made it "patently unreasonable for the jury to have given Blount's testimony any weight at all."

Appellant's argument is not supported by law. "It is firmly imbedded in the law of Virginia that the credibility of a witness who makes inconsistent statements on the stand is a question for the jury, or for the trial court as a trier of the facts sitting without a jury." Swanson v. Commonwealth, 8 Va. App. 376, 378-79 (1989). See also Commonwealth v. McNeal, 282 Va. 16, 22 (2011) ("[A] fact finder's evaluations of credibility are not limited to choosing between competing accounts offered by different witnesses, but often include, as in this case, resolving conflicts in a single witness' testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems incredible." (internal citations omitted)).

Here, assuming that Blount's statements on the stand at trial were inconsistent, the jury apparently believed his testimony that he did not give appellant permission to sign these documents on his behalf. The jury could have concluded that appellant – anxious to avoid a lien by the City on the Bonne Villa property – used his position with the credit union to forge these loans for Blount and Valor without obtaining Blount's permission. The jury was also presented with evidence that Blount's credit union signature card was not signed until months after the credit union loan to Blount was made – after NCUA had repeatedly asked for the credit union's signature cards – bolstering the conclusion that Blount had not agreed to become a member of the credit union in August 2013 when the loan was made. Consequently, we cannot say that no

rational factfinder could have found that appellant signed these documents without Blount's permission and with the requisite fraudulent intent.[8]

### The Commonwealth's Closing Argument

In his last assignment of error, appellant claims, "The Commonwealth improperly argued facts not in evidence, which so infected the jury's deliberations as to render the conviction a denial of Whitaker's rights to due process." He contends that the Commonwealth improperly told the jury that it could compare the signature on appellant's loan documents, signature card, and letters of understanding between the credit union and NCUA with the signatures on the loan applications for Blount and Valor and on Blount's credit union signature card because there was no evidence in the record to establish that any of the documents contained appellant's genuine signature.

Appellant is incorrect in his assertion that there was no evidence to establish that any of these documents contained appellant's genuine signature. Appellant's brother, Phillip Whitaker, testified that appellant personally signed the loan documents for appellant's loan. Therefore, the attorney for the Commonwealth did not argue facts not in evidence when he asked the jurors to compare appellant's actual signature on those documents with the signature on the documents

---

[8] Appellant did not contest the element of prejudice in his brief to this Court. However, at oral argument before this Court, appellant argued that Blount was not prejudiced by appellant's actions because he did not suffer a loss. However, "[a]ctual prejudice is not required. As we have already noted, to uphold a conviction under Code § 18.2-172, the evidence must show only the possibility that the forged instrument may operate to the prejudice of another's right." Beshah v. Commonwealth, 60 Va. App. 161, 171 (2012). Further, the relevant question is whether the forged document could have prejudiced Blount *at the time it was made*. See Stevenson v. Commonwealth, 258 Va. 485, 490 (1999). Although the loan ultimately was paid off by individuals and entities other than Blount, the loans and membership with the credit union could have negatively impacted Blount's financial welfare at the time they were created and while the loans were still outstanding.

purportedly signed by Blount.[9]  In a closing argument, a "Commonwealth's Attorney has the right to argue the evidence and all reasonable inferences from the evidence."  Duncan v. Commonwealth, 2 Va. App. 717, 730 (1986).  Therefore, the trial court did not err in allowing the Commonwealth to make this argument.

### III. CONCLUSION

In short, even assuming without deciding that the trial court erred in granting the special prosecutor's request to appoint the special personnel (thereby allegedly tainting the grand jury's finding of probable cause), that error was cured by appellant's later trial and the return of that different jury's verdict that appellant was guilty beyond a reasonable doubt.  The petit jury's finding of guilt beyond a reasonable doubt demonstrated that not only was there probable cause that appellant had committed forgery but also that appellant was guilty beyond a reasonable doubt.  In addition, the trial court did not err in refusing to quash the indictments based on the special grand jury's not preparing a written report.  The plain language of Code § 19.2-213 does not contain a requirement that a report be prepared when the special grand jury is impaneled at the request of the Attorney for the Commonwealth.

In addition, given the totality of the evidence before the jury, we certainly cannot say that no rational factfinder could have found the evidence sufficient to convict appellant for three counts of forgery.  The evidence established that appellant actually signed the documents for his

---

[9] The jury could also conclude, based on circumstantial evidence, that appellant's genuine signature was on the NCUA letters of understanding.  "While no document may be introduced into evidence without proper authentication, circumstantial evidence may establish authenticity." Wileman v. Commonwealth, 24 Va. App. 642, 648 (1997) (internal citations omitted).  In addition to no witness disputing that the signatures on these documents belonged to appellant, Phillip Whitaker testified that these letters were signed by the board of the credit union, and the evidence established that appellant was a board member of the credit union as well as its CEO. In addition, the cover letters for the NCUA letters of understanding were addressed to Mark Whitaker as Chairperson of the credit union board, and his signature was written above the line designated for the "Board Chairperson."

- 15 -

own loan, and the jury was permitted to compare the handwritten signature on appellant's loan documents with the handwritten purported signature of Blount on the fraudulently signed documents. The jury at trial apparently made this comparison and concluded that appellant was the individual who forged Blount's signature. Furthermore, despite Blount's somewhat inconsistent statements, his credibility was a matter for the jury to decide. The jury clearly credited Blount's testimony that he did not give appellant permission to take out a loan in his name from the credit union and then concluded that appellant forged Blount's name with fraudulent intent.

Finally, the trial court did not err in allowing the Commonwealth to argue in its closing statement that the jury should compare appellant's actual signature on his loan documents with the signatures on the documents at issue. Appellant's brother, Phillip Whitaker, testified that he was present when appellant had personally signed appellant's loan documents, which was sufficient to establish that the signature on those documents was actually appellant's signature. Therefore, the Commonwealth did not argue facts that were not already in evidence.

For all of these reasons, we affirm appellant's convictions for forgery under Code § 18.2-172.

Affirmed.